*Decision will be entered under Rule 50.*

HAROLD D. GREENWALD AND NANA GREENWALD, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2190–62. Filed April 30, 1965.

*John P. Allison* and *Matthew B. Krasner*, for the petitioners.
*James Q. Smith* and *Paul H. Frankel*, for the respondent.

**OPINION**

Raum, *Judge:* In November 1959 petitioner Harold D. Greenwald received distributions from the Madison Trust in the aggregate amount of $168,922.55. The Commissioner determined that such distributions constituted ordinary income rather than capital gain as reported by petitioner, who relied upon section 402(a)(2) of the 1954 Code. By

its terms, section 402(a)(2) applies only in the case of "an employees' trust described in section 401(a), which is exempt from tax under section 501(a)."[1]  The principal question for decision therefore is whether the Madison Trust qualified under section 401(a) for exemption under section 501(a) at the time of the 1959 distributions.  Pertinent provisions of these sections are set forth in the margin.[2]

The Commissioner had ruled in 1945 that the trust, established under Interstate's profit-sharing plan, qualified for exemption under the predecessor provisions of the 1939 Code then in effect.  Subsequent proposed changes in the plan or its operation were scrupulously called to the attention of the Commissioner from time to time during the

---

[1] SEC. 402.  TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST.

(a) TAXABILITY OF BENEFICIARY OF EXEMPT TRUST.—

     \*        \*        \*        \*        \*        \*

(2) CAPITAL GAINS TREATMENT FOR CERTAIN DISTRIBUTIONS.—In the case of an employees' trust described in section 401(a), which is exempt from tax under section 501(a), if the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee on account of the employee's death or other separation from the service, or on account of the death of the employee after his separation from the service, the amount of such distribution \* \* \* shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. \* \* \*

[2] SEC. 401.  QUALIFIED PENSION, PROFIT-SHARING, AND STOCK BONUS PLANS.

(a) REQUIREMENTS FOR QUALIFICATION.—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

(1) if contributions are made to the trust by such employer, or employees, or both, or by another employer who is entitled to deduct his contributions under section 404 (a)(3)(B) (relating to deduction for contributions to profit-sharing and stock bonus plans), for the purpose of distributing to such employees or their beneficiaries the corpus and income of the fund accumulated by the trust in accordance with such plan ;

(2) if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be (within the taxable year or thereafter) used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries ;

(3) if the trust, or two or more trusts, or the trust or trusts and annuity plan or plans are designated by the employer as constituting parts of a plan intended to qualify under this subsection which benefits either—

(A) 70 percent or more of all the employees, or 80 percent or more of all the employees who are eligible to benefit under the plan if 70 percent or more of all the employees are eligible to benefit under the plan, excluding in each case employees who have been employed not more than a minimum period prescribed by the plan, not exceeding 5 years, employees whose customary employment is for not more than 20 hours in any one week, and employees whose customary employment is for not more than 5 months in any calendar year, or

(B) such employees as qualify under a classification set up by the employer and found by the Secretary or his delegate not to be discriminatory in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees ; and

(4) if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees.

SEC. 501.  EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502, 503, 504.

period 1945–53, and a ruling was sought and obtained from him on each occasion (with specified limitations in some instances) that the plan still qualified under the statute after the proposed amendments or changes. Thus, there is no controversy between the parties that the trust was part of a qualified profit-sharing plan and was accordingly tax exempt up to the end of 1953. The essence of the Government's position is that certain events occurred toward the end of 1953 which resulted in a radically different situation thereafter, and that certainly by the time of the 1959 distributions the plan no longer qualified under the statute and the trust was no longer tax exempt.[3] The Government also charges that, in sharp contrast to the numerous detailed communications with the Commissioner in connection with proposed changes during the period 1945–53, the drastically altered situation commencing toward the end of 1953 was never called to his attention and that he thus was never presented with the opportunity of reexamining his ruling in the light of the new facts. It argues that for this latter reason alone, the tax-exempt status of the trust must be deemed forfeited. We do not pass upon this contention because we agree that on the facts developed in this record the trust was not tax exempt in 1959.

At the time of the Commissioner's approval of the plan in 1945 and until December 30, 1953, Interstate was engaged in the manufacture and sale of women's hosiery. Although its stock was publicly traded, the Ivan Selig family, the Lawrence H. Greenwald family, and the Harold D. Greenwald family owned substantial stock interests therein, and these three men, who were its principal officers, appear to have been in control of the enterprise. On December 30, 1953, a drastic change occurred in the affairs of the corporation. On that day it sold its entire business to a subsidiary of Burlington Mills Corp. The assets thus transferred included all of its operating assets, inventories, accounts receivable, leases, goodwill, customers lists, and even its name "Interstate Hosiery Mills," together with a covenant not to compete. The employment contracts of Ivan Selig and Lawrence H. Greenwald were terminated and they were employed by the purchaser of the business. Of the 60 employees covered by the profit-sharing plan at that time, petitioner Harold D. Greenwald alone remained in the employ of Interstate, which changed its name to I.H.L. Corp. as of January 1, 1954. The Madison Trust thereupon liquidated its assets and made payment as of March 31, 1954, to or in behalf of the 59 participating employees whose employment had been terminated

---

[3] There is no dispute that if the plan in fact fails to qualify under the statute by reason of the changed factual situation the Commissioner is not bound by his prior rulings approving the plan on the basis of the facts then presented to him.

by the end of 1953. The total amount in the trust was then $709,597.84, of which $619,445.97 was paid out in respect of those 59 employees. The $90,281.08 undistributed balance was allocable solely to petitioner Harold D. Greenwald. He was in charge of running I.H.L.'s affairs, which consisted merely of investment of its funds. Also, following the distributions to the participating employees (other than Harold D. Greenwald), a brokerage account was opened in the name of the Madison Trust, and its funds, allocable solely to Harold D. Greenwald, were used to purchase corporate securities. There was active trading in that account.

As of January 1, 1954, there were 44,991 shares of I.H.L. outstanding, but, as a consequence of what plainly appears to have been a program of having the corporation purchase the shares of stockholders other than those of the Harold D. Greenwald family, the number of outstanding shares was progressively reduced to 9,940 as of 1959. Over 97 percent of such 9,940 outstanding shares were owned by the Harold D. Greenwald family as of January 1, 1959, a portion of which (1,220 shares) was transferred to the Madison Trust later in January and in April of that year. I.H.L.'s corporate existence was finally terminated in 1959, following the acquisition of its assets by Fundamental Investors, Inc., an unrelated, regulated, open-end investment company, in exchange for stock. At about the same time the Madison Trust made distributions of its total assets, then aggregating $168,922.55, to petitioner.

We find it impossible to conclude on the facts before us that the Madison Trust was a tax-exempt entity in 1959. The question is not whether it was part of a qualified profit-sharing plan when first approved in 1945 or whether it continued to enjoy such status up to the sale of the hosiery business toward the close of 1953. The question is whether it was tax exempt in 1959. And the answer depends not merely upon the form of the plan but upon "its effects in operation." See Income Tax Regs., sec. 1.401–1(b)(3).

Following the sale of the hosiery business, the employer corporation became transformed from a widely held operating company to an investment company and ultimately to a family-owned investment company. All of its participating employees, except petitioner, left its employ as a result of the 1953 sale of the business. Petitioner remained with a substantial salary as the chief executive officer of I.H.L. The corporation also had several other employees who received far more modest compensation and who in no way participated in any of the benefits of the plan. It is inconceivable that the Commissioner would ever have approved the plan and sanctioned the tax-exempt status of the Madison Trust upon the facts as they existed after 1953.

The Government correctly characterizes the Madison Trust during this period as "nothing more than a tax-exempt fund utilized on behalf of its sole participant, Harold D. Greenwald, for tax-free trading in stocks and bonds." To hold that the trust was tax free in the circumstances disclosed herein would be to disregard the plainly expressed legislative declaration that benefits provided under the plan may not discriminate in favor of employees who are officers, shareholders, supervisory employees, or highly compensated employees. See sec. 401(a)(4), *supra* fn. 2. Petitioner's relationship to I.H.L. was such that the plan would be disqualified on each of these four grounds.

Of course, we do not suggest that a plan becomes disqualified merely because, in the normal course of the employer's business, the number of participating employees is reduced to one. Cf. *Marjorie F. Birnie*, 12 T.C.M. 867, where the pivotal issue was whether the remaining beneficiary of the trust was a "supervisory employee." But a one-employee plan where the beneficiary falls within one of the four categories in whose favor the plan may not discriminate may be a wholly different matter, particularly in circumstances such as those disclosed by this record. Cf. Rev. Rul. 55–81, 1955–1 C.B. 392; Rev. Rul. 63–108, 1963–1 C.B. 87. This is not a case where the sole remaining employee was retained merely for the purpose of winding up the affairs of the employer. Here, the corporation continued to operate in an entirely new activity, namely, the investment business; and the maintenance of the so-called profit-sharing fund for petitioner's sole benefit for a prolonged period as a means of tax-free trading in securities is wholly outside the purpose of the statutory provisions.

However, even assuming that Harold D. Greenwald were not a member of any of the four classes, the plan would be disqualified after 1953 for an entirely different reason. Section 1.401–1(b)(2) of the regulations makes clear that the plan must provide for "recurring and substantial contributions out of profits for the employees." To be sure, where failure to contribute is the result of decreased earnings due to business reverses and where there is no reason to assume that previously attained profit levels will not be reached again, a plan may well continue to remain qualified. Cf. *Sherwood Swan & Co.*, 42 T.C. 299. But the situation here is entirely different. The formula for the employer's contributions was based upon Interstate's operation as a hosiery manufacturer. Upon the sale of that business and the progressive reduction of the corporation's assets through repurchase of some 77 percent of its outstanding stock, it became a virtual certainty that the corporation's earnings would never reach the level required by the formula for any contribution to the trust. In effect the corporation abandoned the plan. For this reason as well, the plan failed to qualify during its later years.

The Government has presented other arguments calling for the disqualification of the plan, but we need not consider them. Nor is it necessary to pass upon its contention that petitioner is not entitled to capital gains treatment with respect to the Madison Trust distribution because it was not made on account of his "separation from the service" as required by section 402(a)(2).

*Decision will be entered under Rule 50.*