Harold D. GREENWALD and Nana Greenwald, Petitioners on Review,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent on Review.

No. 391, Docket 30247.

United States Court of Appeals Second Circuit.

Argued May 12, 1966.

Decided Sept. 13, 1966.

John P. Allison, New York City (Arthur L. Kimmelfield and Matthew B. Krasner, New York City, with him on the brief), for petitioners.

Anthony Zell Roisman, Atty., Dept. of Justice, Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson and David O. Walter, Attys., Dept. of Justice, Washington, D. C., with him on the brief), for respondent.

Before WATERMAN, MOORE and ANDERSON, Circuit Judges.

MOORE, Circuit Judge:

This is a petition for review of a decision of the Tax Court, Raum, J., 44 T.C. 137 (1965), holding that a profit-sharing trust for salaried employees of a company, although originally tax-exempt, had lost its tax-exempt status by reason of radical changes in the nature of the company, so that lump-sum distributions from the trust should have been taxed as

ordinary income, rather than as capital gains, as reported by petitioners.

Petitioners, Harold D. Greenwald and Nana Greenwald, husband and wife, filed joint income tax returns for the years 1958, 1959 and 1960 with the District Director of Internal Revenue in New York City, where petitioners reside. Since Mrs. Greenwald is involved in this case only by virtue of having filed joint returns with her husband, we shall hereafter refer to Harold Greenwald as the taxpayer.

The taxpayer was a principal officer of Interstate Hosiery Mills, Inc., a Delaware corporation engaged in the manufacture and sale of women's hosiery. Stock of Interstate was publicly held and traded. A substantial minority interest was owned by its principal officers, taxpayer, Ivan Selig, and Lawrence Greenwald, and their families.

In 1945, Interstate set up a profit-sharing trust, which eventually changed its name to "The Madison Trust." The trust included only salaried employees as participants, and provided that "those Participating Employees owning directly or indirectly 10% or more of the voting stock of the Corporation shall not have allocated to them in any year in the aggregate more than 30% of the Corporation's contribution to the Trust for such year or amounts forfeited under the provisions of this plan in such year." In general, the contribution formula required Interstate to contribute 30 percent of its annual profits (before taxes) in excess of $100,000 to the trust.

The Commissioner approved the plan on May 23, 1945. Several amendments were made in the plan during the next several years. Each was submitted to the Commissioner, who ruled in each case that the plan still qualified as a tax-exempt employees' profit-sharing trust after the amendment.

Towards the end of 1952, negotiations began between Interstate and Burlington

Mills Corp. about the possibility of a sale of Interstate to Burlington Mills. These negotiations broken off at the start of 1953, were resumed in August 1953 and led finally to an agreement dated December 9, 1953, under which Green Cove Hosiery Corp., a subsidiary of Burlington Mills formed for the express purpose of acquiring the assets. of Interstate, agreed to buy all of the assets of Interstate, including its name, customer list, and good will. This agreement was consummated on December 30, 1953.

59 of the 60 persons who had been participating employees in the Interstate profit-sharing trust left Interstate at the time of the sale, at least some of them to work for Green Cove. Only the taxpayer remained as a participant in the profit-sharing trust of the company, which on January 1, 1954, changed its name from Interstate to "I.H.L. Corporation."

After distributions to the departing employees on March 31, 1954, $90,281.08 in cash and Government "G" bonds remained in the Madison Trust, all of it credited to the account of the taxpayer.

I. H. L. was engaged in the investment business until 1959. During the period 1954–1959, I. H. L. gradually purchased a considerable amount of its own shares. On January 1, 1954, I. H. L. had 44,991 shares outstanding and 53,300 shares in its treasury; on January 1, 1959, I. H. L. had only 9,940 shares outstanding and 88,351 in its treasury. 97% of the shares outstanding on January 1, 1959 were controlled by Harold Greenwald or members of his immediate family.

I. H. L. never made $100,000 a year in pre-tax profits,[1] and as a result no contributions by I. H. L. were made to the profit-sharing trust from 1954 to 1959. During those years, taxpayer was the only participating employee in the trust. I. H. L. employed two secretaries who were not participating employees, and in 1958 and 1959 taxpayer's two sons re-

---

[1]. Its highest taxable income was $41,495.38, for the year 1955. Its highest income for accounting purposes also occurred in 1955, in which year capital gains not included in taxable income by reason of a capital loss carryover brought income up to $77,837.16.

ceived salaries, but did not qualify for participation in the trust.

On July 31, 1959, I. H. L. entered into a reorganization agreement with Fundamental Investors, Inc., an unrelated regulated open-end investment company, under which agreement Fundamental agreed to acquire substantially all of the assets held by I. H. L. in exchange for stock of Fundamental. The transaction was consummated on October 1, 1959. I. H. L. then distributed its assets to its shareholders and was dissolved. In the process, the Madison Trust received 14,-640 shares of Fundamental stock which, together with $31,266.83 in cash, the trust transferred to Harold Greenwald in November 1959. Petitioners reported the value of the distribution from the trust in their 1959 tax return as $168,-922.55, and reported this amount as a long-term capital gain, namely, as a distribution to an employee from a tax-exempt profit-sharing trust.

The Commissioner contends, and the Tax Court held, that the fundamental changes in the nature of the employer's business as a result of the sale of assets in 1953 meant that what had hitherto been a tax-exempt profit-sharing trust lost its tax-exempt status.

■ We agree with the Commissioner that the profit-sharing trust lost its tax-exempt status.

The statute requires that if an employees' trust is to qualify, "contributions or benefits provided under the plan" must not "discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees." § 401 (a) (4). After the sale of assets in 1953, the employees' trust as maintained by I. H. L. was operated only for the benefit of one man: the taxpayer. He was the only salaried employee who participated in the plan. Nor was it at all likely that other salaried employees would be hired by the company. The company's sole business was investing in stocks, bonds, notes, mortgages and real estate,

with funds which were progressively reduced by the company program of purchasing its own stock from shareholders who were not members of Greenwald's family. It had no need of—and could not well afford—more salaried employees. Discrimination in favor of the taxpayer, who was at once an officer, a shareholder, a supervisor, and a highly compensated employee, was built into the operation of the trust after 1953. Contrast Rev. Rul. 55–81, 1955–1 Cum.Bull. 392 (employees' trust may qualify even if only one employee is covered, if employer has only one employee and plan is not inherently discriminatory).

■ It is true that the trust as originally set up was not discriminatory. Contrast Rev.Rul. 63–108, 1963–1 Cum. Bull. 87 (trust as organized could have only one beneficiary). However, the fact that the trust once qualified does not mean that it could not lose its qualification by becoming discriminatory in operation. See Rev.Rul. 57–587, 1957–2 Cum.Bull. 260 (plan lost qualification when it became discriminatory in operation as a result of withdrawals by lower-paid employees).

It is also true that no contributions were made by the employer to the trust after 1953, so that the trust cannot be said to have been used as a means of siphoning off corporate profits for the benefit of shareholders and officers without the payment of a tax. However, an employees' trust affords other benefits to its participants than shares in contributions from the employer. The income of the trust itself is tax-free, and taxation of such increases in corpus as the trust is able to secure is deferred until distribution, and then taxed only at capital gains rates. These were the considerable benefits that taxpayer may have hoped to secure for himself by the continued operation of the Madison Trust; and these benefits, as we have seen, would accrue only to the taxpayer and not the other employees. This discrimination in favor of the taxpayer was in itself sufficient to cause the trust to lose its qualified status. We need not

and do not consider the other arguments for loss of qualification advanced by the respondent.

Taxpayer argues that he had to keep the trust in operation at the time of the transformation of the business from a hosiery manufacturer to an investment company. We do not find this argument persuasive. There is no reason why I. H. L. could not have sold its assets to another company—perhaps even one controlled by the taxpayer—and then liquidated, with a distribution of trust assets accompanying the dissolution of the employer. Cf. United States v. Johnson, 331 F.2d 943 (5th Cir. 1964). Taxpayer contends that he might not have had the power to arrange such a transaction; but we fail to see why the shareholders of I. H. L. would have objected. They had already gone along with the much more radical transformation of the company from a hosiery manufacturer to an investment company. In the alternative, taxpayer could have worked towards the modification of the trust to provide for nondiscriminatory treatment of all I. H. L. employees—for example, by changing the formula for contribution by the employer so that amounts would be set aside for I. H. L.'s two secretaries.

■ The Commissioner and the Tax Court concluded that no part of the 1959 distributions to taxpayer from the profit-sharing trust was taxable at capital gains rates. With this conclusion we disagree. It is true that after the corporate transformations of December 30, 1953–January 1, 1954, and the trust distribution on March 31, 1954, the profit-sharing trust became discriminatory in operation and lost its tax-exempt status.[2] However, the amount standing to taxpayer's credit on the books of the Madison Trust on March 31, 1954—some $90,281.08—apparently would have been taxable at capital gains rates had it been distributed to taxpayer

within the taxable year on account of his separation from service. The other employees of Interstate most probably received capital gains treatment as to the amounts distributed to them. It would be harsh to treat taxpayer differently, merely because he stayed on with the same employer after the radical transformation of its business.

Nor is such harshness required by the statute. Section 402(a) (2) affords capital gains treatment to distributions payable "in the case of" exempt trusts. Section 402(b) provides that distributions distributed or made available by any trust which is not exempt under § 501 should be governed by § 72, relating to annuities—in other words, should be taxable as ordinary income. There is no reason in the statute or elsewhere why we should not consider that portion of the 1959 distribution equivalent to the amount standing to taxpayer's credit in the profit-sharing trust before it became discriminatory in operation, as a distribution from an exempt trust, and so entitled to capital gains treatment. The remainder of the 1959 distribution represents a distribution from a discriminatory trust, and so is properly includable in taxpayer's 1959 income at ordinary income rates. Such a result seems consistent with the underlying purpose of the statute, since it affords capital gains treatment only so long as a profit-sharing trust remains nondiscriminatory in operation. Moreover, the result gains support in the language of § 402(b), which envisages a year-by-year consideration of whether or not a profit-sharing trust is tax-exempt.

For the foregoing reasons, we hold that taxpayer is entitled to capital gains treatment on $90,281.08 of the 1959 distribution from the Madison Trust, the remainder of the distribution being taxable as ordinary income.

Affirmed in part and reversed in part.

2. The Tax Court found that the former employees of Interstate participated in the Madison Trust until March 31, 1954. We assume that they participated in whatever gain in the assets of the trust took place between December 31, 1953, and March 31, 1954, so that the discriminatory operation of the trust may be said to have commenced only from the latter date.