PERRY EPSTEIN AND MILDRED EPSTEIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6393–75.     Filed June 13, 1978.

*S. Sidney Mandel,* for the petitioners.
*H. Stephen Kesselman* and *Richard S. Kestenbaum,* for the respondent.

## OPINION

TANNENWALD, *Judge:* Respondent determined a deficiency of $12,389 in petitioners' 1971 Federal income tax. The sole issue for decision is whether an amount received upon the termination of a pension plan should be taxed as ordinary income or as a capital gain.

All of the facts have been stipulated and are found according-

ly. The stipulation of facts and the exhibits attached thereto are incorporated herein by reference.

Perry Epstein (petitioner) and Mildred Epstein are husband and wife. They resided in Miami Beach, Fla., at the time the petitioner herein was filed.[1]

Luanep Corp. (formerly Effanbee Doll Corp.) was a New York corporation which manufactured dolls. Hereinafter "the corporation" will refer to both Luanep Corp. and Effanbee Doll Corp. It was incorporated on February 26, 1953. By 1964, its outstanding shares were owned in equal parts by Bernard Baum (Baum), Morris D. Lutz (Lutz), and petitioner. Baum died on November 10, 1966, and the corporation subsequently redeemed his stock interest.

The corporation established a pension plan for the benefit of certain qualified employees which became effective on February 1, 1965. Simultaneously, a trust was created to receive the contributions to be made pursuant to the plan. On December 17, 1965, the District Director of Internal Revenue for the Brooklyn, N. Y., District determined that the plan as then amended was qualified for purposes of section 401(a).[2]

The plan provided that a participant, upon normal retirement, was to receive a monthly payment of 20 percent of his "basic compensation" received during the 5 consecutive years in which his compensation was highest, less 93.6 percent of social security payments. For purposes of the plan, "compensation" was defined to exclude overtime pay, bonuses, commissions, contributions to pension or profit-sharing plans, and insurance benefits.

The corporation's board of directors was empowered to terminate the plan. Upon termination, the trustee was required to set aside sufficient assets to meet liabilities other than those payable in the future to plan participants and to distribute the remaining assets to the plan participants. The distribution of the trust assets was subject to the following limitations:

16.7 Notwithstanding any provisions in this Agreement to the contrary, if during the first ten years after the effective date hereof, the Plan is terminated * * * then the benefits provided by the Company's contributions for Participants whose annual benefit provided by such contribution will

---

[1] Mildred Epstein is a party to this proceeding only by virtue of having filed a joint return with petitioner.

[2] All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.

exceed $1,500 but applicable only to the twenty-five Highest Paid Employees as of the time of establishment of the Plan (including any such Highest Paid Employees who are not Participants at the time but may later become Participants) shall be subject to the following conditions:

(a) Such benefits shall be paid in full which have been provided by the Employer's contributions for such Highest Paid Employees, not exceeding the larger of the following amounts:

(1) $20,000; or

(2) An amount equal to 20% of the first $50,000 of the Participant's average regular annual compensation multiplied by the number of years since the effective date of this Plan.

\* \* \* \* \* \* \*

(e) In the event of the termination of the Plan within 10 years after the effective date, distributions to then unretired Participants other than the Participants described in the first paragraph of this Section shall include an equitable apportionment among such other Participants of all excess benefits purchased by Company contributions for the Participants described in the first paragraph of this Section, in the manner following: to each such other Participant in the ratio that the value of the accumulated reserve then credited to him bears to the total value of the accumulated reserve under the Plan.

During the period in which it was effective, the plan covered between 10 and 12 participants. Approximately 100 employees were excluded by reason of their being covered by a collectively bargained pension plan, which exclusion was considered by respondent in his initial determination of plan qualification. After Baum's death in 1966, two plan participants, Lutz and petitioner, were officer-shareholders and highly compensated employees.

Petitioner's health began to fail during 1969, and in October of that year he suffered a coronary attack. The corporation's gross sales declined from $2,020,531 for the fiscal year ending February 28, 1969, to $1,765,671 for the fiscal year ending February 28, 1970, and to $1,686,849 for the fiscal year ending February 28, 1971.

By agreement dated October 7, 1971, the corporation sold its business and all of its assets to Royanlee Doll Corp. (Royanlee). The agreement provided that the pension plan was not to be conveyed to Royanlee and that the corporation was to terminate the plan and have the assets thereof distributed.

On October 20, 1971, the corporation's board of directors amended certain provisions of the plan relating to termination and decided to make no further contributions under the plan. Section 16.7(a)(2) of the plan was amended to read as follows:

(2) An amount equal to 20% of the first $50,000 of the Participant's annual compensation multiplied by the number of years since the effective date of the plan. The term "annual compensation" of a Participant means either such Participant's average compensation over the last five years, or such Participant's last annual compensation if such compensation is reasonably similar to his average regular compensation for the five preceding years.

Salary, bonus, and total compensation received by petitioner and Lutz from the corporation are as follows:

| Year | Salary | Bonus | | Total compensation |
|------|--------|-------|------|-------------------|
| 1967 | $25,000 | Petitioner | $15,000 | $40,000 |
|      | 25,000 | Lutz | 16,950 | 41,950 |
| 1968 | 30,000 | | 20,000 | 50,000 |
| 1969 | 30,000 | | 20,000 | 50,000 |
| 1970 | 30,000 | | 400 | 30,400 |
| 1971 | 35,400 | | 15,400 | 50,800 |

Petitioner and Lutz were the only plan participants to receive bonuses during the entire operation of the plan. Annual compensation excluding overtime, but including bonuses, was the base used for computing the amount received on termination for all plan participants.[3] The amounts actually distributed on termination to the plan participants and the percentage of distributions to total compensation for all plan years are as follows:

| Participant | Shareholder officer | Supervisor | Amount distributed | Percent of total compensation |
|-------------|--------------------|------------|--------------------|-------------------------------|
| Lutz ................... | yes | yes | $46,579.84 | 14.92 |
| Epstein ............... | yes | yes | 44,417.45 | 14.37 |
| Keller ................ | no | yes | 4,827.05 | 6.22 |
| Caputo ............... | no | yes | 2,584.28 | 2.55 |
| Kmetz ................ | no | yes | 2,484.02 | 2.92 |
| Dukas ................ | no | no | 1,297.10 | 1.73 |
| Goldstein ............ | no | no | 1,243.57 | 1.62 |
| Elkin ................. | no | no | 4,325.47 | 5.88 |
| Beck .................. | no | no | 4,844.77 | 7.36 |
| Bailey ................ | no | no | 109.79 | 1.03 |
| Siegel ................ | no | no | 4,213.73 | 9.01 |
| Davis ................. | no | no | 625.07 | 5.24 |
| Hecht ................. | no | no | 1,640.37 | 5.32 |

Petitioner reported the amount received on termination as a

---

[3] The record indicates that petitioner and Lutz each received a salary of $23,000 in 1965 and $25,000 in 1966, but there is no indication as to whether either of them received bonuses during those years.

long-term capital gain. The respondent determined that the distribution was from a nonqualified plan and that the amount received should be treated as ordinary income.

The primary issue herein is whether the amount received by petitioner is to be considered as a distribution from a qualified or nonqualified plan. Respondent contends that the plan was not qualified at the time of termination because it discriminated in operation, in accordance with the amendment, in favor of officers, shareholders, supervisors, or highly compensated employees in violation of section 401(a)(4).[4] We agree with respondent.

It is clear that, from its inception until the October 1971 amendment, the plan provided that the computation of retirement benefits was to be based upon the participants' compensation, excluding bonuses. It is equally clear that at no time during the years in which the plan was in operation did any employee other than petitioner and Lutz receive a bonus. When the corporation amended the plan to provide that the limitation on benefits to be distributed to its 25 highest paid employees be changed to "annual compensation" from "average regular annual compensation" and proceeded to include bonuses in calculating the benefits to be distributed (and, in fact, distributed) to participants, a discrimination in favor of petitioner and Lutz obviously occurred.

Petitioner concedes that the purpose of the amendment to the plan was to permit larger distributions to him and Lutz, but seeks to justify such action on the ground that the amendment merely brought their rights up to the limit of existing law. Such an argument misses the point. The question herein is, not whether the plan conformed to the limits permitted by respondent's regulations (sec. 1.401–4(c), Income Tax Regs.), but whether, by virtue of the October 1971 amendment, a change occurred which produced a prohibited discrimination even though those limits were not exceeded. The inclusion of bonuses and salary in the actual calculation of the benefits paid to

---

[4]Sec. 401(a)(4) provides for qualification of a pension plan "if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees."

444

petitioner and Lutz, but only salary in respect of other employees,[5] assured petitioner and Lutz of receiving a more favorable treatment than the other participants. Cf. *Bernard McMenamy Contractor, Inc. v. Commissioner*, 54 T.C. 1057, 1062 (1970), affd. 442 F.2d 359 (8th Cir. 1971). Nor can petitioner derive any sustenance from the fact that the plan was once qualified; the key is whether the amendment caused the plan to lose such status. See *Greenwald v. Commissioner*, 366 F.2d 538, 540 (2d Cir. 1966), affg. on this issue 44 T.C. 137 (1965).[6]

In the foregoing context, no purpose would be served by dissecting petitioner's semantical analysis of the phrases "average regular annual compensation," "average compensation," or "last annual compensation," as used in the amendment to the plan or in respondent's regulations (see sec. 1.401–4(c)(2)(ii)(c), Income Tax Regs.). If these phrases are interpreted to include bonuses, the change in the base for determining benefits caused a discrimination because it favored petitioner and Lutz. If they are interpreted as not including bonuses,[7] then the benefits paid violated the plan and were equally discriminatory in light of the stipulation that the bonuses were in fact used in the base for computing such benefits. Nor should we attempt to reconstruct the benefits, as petitioner would have us do, in order to bring the distributions, and therefore the plan as amended, within the boundaries of respondent's regulations. Cf. *Quality Brands, Inc. v. Commissioner*, 67 T.C. 167, 175 (1976).

Finally, petitioner contends that even if the plan is held not qualified at the time of distribution for purposes of section 401(a) (with the result that the trust was not exempt from tax under section 501(a)), we should nevertheless treat a portion of the distributions to petitioner as long-term capital gain rather than as ordinary income. Relying on *Greenwald v. Commissioner, supra*, and *Pitt v. United States*, an unreported case (M.D. Fla. 1975, 35 AFTR 2d 75–1492, 75–1 USTC par. 9472), petitioner argues that he should be entitled to capital gain treatment for that portion of the distribution which is not in excess of the

[5]The record reveals that at least some of the other employees received compensation other than salary—presumably overtime.

[6]Thus, petitioner's attempt to rely on respondent's apparent concession in other litigation that the plan was qualified for the fiscal year ending Feb. 28, 1971, is totally misplaced.

[7]In this connection, we note that the definition of "compensation" contained in par. 1.8 of the plan specifically excluded "bonuses" for purposes of the plan "except where the contrary is expressly stated" and that this definition was not changed at the time the plan was amended.

amount he would have received had the plan been operated in a nondiscriminatory manner. This argument is without merit.

In *Greenwald v. Commissioner, supra,* the changed circumstances came about through the implementation of the plan in accordance with its original terms after the business was sold, and the Second Circuit felt that it would be a harsh result to preclude the taxpayer from receiving the benefits of capital gain treatment on amounts which would have been entitled to such treatment if the plan had been terminated and he had received his distributions at the time of sale.[8] By way of contrast, the change in circumstances herein came about through a deliberate act of amending the plan. That case is, therefore, clearly distinguishable. *Pitt* arguably is more in point because the "prohibited transaction," which caused the trust therein to lose its exempt status, could be characterized as a deliberate action. Nevertheless, such action did not involve a change in the base for calculation of benefits paid, as is the case herein, and, therefore, that case is also distinguishable. In view of the foregoing analysis, we need not decide whether we agree with the reversal of our decision in *Greenwald* or the district court's decision in *Pitt.*

Granted that variations in benefits may be provided under a qualified plan, it is a requisite for retention of qualification that such benefits not discriminate in favor of employees in the prohibited group. See sec. 1.401–4(a)(2)(iii), Income Tax Regs. Compare Rev. Rul. 71–26, 1971–1 C.B. 120. By amending the plan herein, the corporation sought to walk as close to the edge of the cliff as possible in an attempt to obtain the maximum benefits for petitioner and Lutz and still stay within the requirements of the statute and respondent's regulations. The corporation stumbled and the plan fell over the cliff. Its deliberate action produced the result that the plan no longer was qualified and the distribution to petitioner should be taxable as ordinary income. Cf. *Bernard McMenamy Contractor, Inc. v. Commissioner,* 54 T.C. at 1063, wherein we stated:

It seems clear to us that to carry out the purposes of the nondiscrimination requirements of section 401, we must hold that the deliberate adoption of a formula for allocating contributions under a profit-sharing plan that favors

---

[8]See also *Enright v. Commissioner,* T.C. Memo. 1976–393.

members of the prohibited group is discriminatory within the meaning of such section, irrespective of the reasons for adopting such a formula.

*Decision will be entered for the respondent.*

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.