CURTIS B. WOODSON AND ESTATE OF FERN R. WOODSON, DECEASED, CURTIS B. WOODSON, INDEPENDENT EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 646–79.     Filed February 5, 1980.

Curtis B. Woodson, pro se.
*David W. Johnson,* for the respondent.

### OPINION

STERRETT, *Judge:* In a notice of deficiency dated October 6, 1978, respondent determined a deficiency in the income taxes paid by petitioners for their taxable years ended December 31, 1970 and 1971, in the amounts of $512.34 and $6,491.60, respectively. After concessions, the only remaining issue for our decision is whether that part of the net distribution, which was received from a profit-sharing trust not qualified or exempt under sections 401(a) and 501(a), I.R.C. 1954, that is attributable to contributions made to the trust in years when it was qualified, should be taxed as ordinary income or as long-term capital gain.

This case was submitted under Rule 122, Tax Court Rules of Practice and Procedure. Hence, all of the facts have been stipulated and are so found.

Curtis B. Woodson resided in Corpus Christi, Tex., at the time the petition was filed herein. Curtis B. Woodson and Fern R. Woodson (petitioners) were husband and wife until the death of Fern R. Woodson on November 3, 1971. Curtis B. Woodson was appointed independent executor of the Estate of Fern R. Woodson, deceased. Petitioners filed their joint Federal income tax return for 1971 with the Director, Internal Revenue Service Center, Austin, Tex.

Curtis B. Woodson and Edna Woodson, married in 1973, filed joint income tax returns for 1973 and 1974 with the Director,

Internal Revenue Service Center, Austin, Tex. On or about May 6, 1974, Curtis B. Woodson filed an application for tentative refund (Form 1045) claiming a refund of $33.01 for taxable year 1971 based on the carryback of unused investment credit in that amount from taxable year 1973.

On or about March 3, 1975, Curtis B. Woodson filed an application for tentative refund (Form 1045), claiming a refund of $41,388.96 for taxable year 1971 based on claimed operating loss carryback from 1974 to taxable year 1971. On or about May 22, 1974, and March 13, 1975, petitioners received refunds of their 1971 taxes in the amounts of $33.01 and $41,388.96, respectively, for a total tentative allowance of $41,421.97 for the 1971 taxable year.

In 1974, Curtis B. and Edna Woodson received a net lump-sum distribution from the profit-sharing trust of Gibson Products Co. of Corpus Christi, Inc., in the amount of $25,485.98 (total distribution of $30,052.81 less employees' contributions of $4,566.83). This distribution represented their entire interest in the trust.

Gibson Products Co. of Corpus Christi, Inc. (hereinafter Gibson Products), a small business corporation, was incorporated in April 1961 and had a fiscal year ending March 31. Curtis B. Woodson was president of the corporation during all years relevant to this case. The corporation was liquidated as of December 27, 1974. As of that date, the shareholders were as follows:

| | |
|---|---|
| Curtis B. Woodson | 226 shares |
| Estate of Fern R. Woodson, deceased | 283 shares |
| Curtis B. Woodson as custodian for David Woodson | 56 shares |

David Woodson is petitioners' son.

The corporation had a profit-sharing trust from 1966 until September 9, 1974, when the trust was terminated. Curtis B. Woodson and Edna Woodson were each members of the profit-sharing trust. The profit-sharing trust was qualified under section 401(a) from 1966 until April 1, 1973, the effective date of the revocation of its exempt status by respondent. Petitioners do not contest the revocation of its exempt status. The revocation letter, dated July 30, 1975, from the Office of the District Director of Internal Revenue, Austin, Tex., to Gibson Products

stated in part: "In view of the fact that benefits were forfeited on partial termination of the plan and funds were diverted to purposes other than for the exclusive benefit of the participants, our determination letters referred to above are hereby revoked, effective April 1, 1973."

Of the net distribution of $25,485.98 received by petitioners, $2,643.39 was attributable to contributions to the trust made during the period of time following the loss of its exempt status until its termination on September 9, 1974.

In 1974, Curtis B. and Edna Woodson received a net lump-sum distribution from the Gibson Products Co. profit-sharing trust of $25,485.98, which represented their entire interest in the trust. The only issue before the Court is whether any part of the distribution was from a qualified trust. The tax stakes are clear. If the distribution is deemed from a qualified trust exempt from tax under sections 401(a) and 501(a), I.R.C. 1954, then section 402(a)(2)[1] allows petitioners to characterize the income as long-term capital gain. That part of the distribution which is from a nonqualified trust is controlled by section 402(b)[2] which treats it as ordinary income.

---

[1]SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST.

(a) TAXABILITY OF BENEFICIARY OF EXEMPT TRUST.—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(2) CAPITAL GAINS TREATMENT FOR PORTION OF LUMP SUM DISTRIBUTION.—In the case of an employee trust described in section 401(a), which is exempt from tax under section 501(a), so much of the total taxable amount (as defined in subparagraph (D) of subsection (e)(4)) of a lump sum distribution as is equal to the product of such total taxable amount multiplied by a fraction—

(A) the numerator of which is the number of calendar years of active participation by the employee in such plan before January 1, 1974, and

(B) the denominator of which is the number of calendar years of active participation by the employee in such plan,

shall be treated as gain from the sale or exchange of a capital asset held for more than 6 months. For purposes of computing the fraction described in this paragraph and the fraction under subsection (e)(4)(E), the Secretary or his delegate may prescribe regulations under which plan years may be used in lieu of calendar years. For purposes of this paragraph, in the case of an individual who is an employee without regard to section 401(c)(1), determination of whether or not any distribution is a lump sum distribution shall be made without regard to the requirement that an election be made under subsection (e)(4)(B), but no distribution to any taxpayer other than an individual, estate, or trust may be treated as a lump sum distribution under this paragraph.

[2]SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST.

(b) TAXABILITY OF BENEFICIARY OF NONEXEMPT TRUST.—Contributions to an employees' trust made by an employer during a taxable year of the employer which ends within or with a taxable year of the trust for which the trust is not exempt from tax under section 501(a) shall be included in the gross income of the employee in accordance with section 83 (relating to property transferred in connection with performance of services), except that the value of the employee's interest in the trust shall be substituted for the fair market value of the property for purposes of applying such section. The amount actually distributed or made available to any distributee by any such trust shall be taxable to him in the year in which so distributed or made available, under section 72 (relating to annuities),

Petitioners concede that the part of the distribution which represents contribution to the trust following the loss of its exempt status ($2,643.39) is a distribution from a nonqualified plan and is ordinary income. Petitioners, citing the Second Circuit's decision in *Greenwald v. Commissioner*, 366 F.2d 538 (2d Cir. 1966), revg. in part 44 T.C. 137 (1965), argue that, although the $2,643.39 should be taxed as ordinary income in 1974, the remaining $22,842.59 of the net distribution should be treated as a distribution from a qualified plan and therefore taxed as long-term capital gain.[3]

Respondent argues that, since the plan and its related trusts were nonexempt in the year of distribution, this Court's decisions in *Greenwald v. Commissioner, supra,* and *Epstein v. Commissioner*, 70 T.C. 439 (1978), require the distribution be taxed as ordinary income under section 402(b). In *Greenwald v. Commissioner*, we found that the profit-sharing plan in issue was not exempt at the time the distribution was made in 1959 and held that the entire distribution was taxable as ordinary income pursuant to section 402(b). On appeal, the Court of Appeals for the Second Circuit agreed that the plan was nonexempt, but reversed in part the decision of this Court and held that the distribution attributable to contributions made to the plan during the time it was qualified under section 401(a) was taxable as capital gain under section 402(a)(2).

The possibility of taxing the trust distribution partly as capital gain and partly as ordinary income was not argued in this Court by the parties in *Greenwald*. Only on appeal, and then only in supplemental briefs submitted at the behest of the Court of Appeals, was that result considered. In that sense, we face that issue for the first time.[4]

Who did what, is obviously a relevant question in determining whether a plan has lost its exempt status. It is not a relevant question, in consideration of the issue, whether a distribution

---

except that distributions of income of such trust before the annuity starting date (as defined in section 72(c)(4)) shall be included in the gross income of the employee without regard to section 72(e)(1) (relating to amount not received as annuities). A beneficiary of any such trust shall not be considered the owner of any portion of such trust under subpart E of part I of subchapter J (relating to grantors and others treated as substantial owners).

[3]*Pitt v. Commissioner*, an unreported case (M.D. Fla. 1975, 35 AFTR 2d 75–1492, 75–1 USTC par. 9472), also involved this same issue. In that case, the District Court, without elaboration, expressly followed the Second Circuit's rationale in *Greenwald v. Commissioner*, 366 F.2d 538 (1966).

[4]In *Epstein v. Commissioner*, 70 T.C. 439, 444 (1978), we stated the question of law but resolved the matter on the facts.

must be taxed as all ordinary income or part ordinary income and part capital gain, since the distribution should be taxed the same whether the recipient is the one who caused the disqualification by some misfeasance or is an innocent lower-echelon employee.

Section 402(a) is entitled "Taxability of Beneficiary of Exempt Trust" and provides in paragraph (1) thereof that an amount actually distributed from an exempt trust shall be taxable to the distributee "in the year in which so distributed or made available, under section 72." Paragraph (2) goes on to provide that any total or lump-sum distribution within 1 year, under circumstances satisfied herein, shall be treated as capital gain. Absent the foregoing provision, the recipient would be compelled to take the entire distribution, resulting from perhaps years' accumulations, into income in 1 year, thereby distorting his tax liability viewed from the perspective of the years over which the income was in reality earned. This is so because the employer's contributions were exempt from tax to the beneficiary at the time made, and hence, the beneficiary never earned a basis in his account which he could offset against a subsequent distribution.

Section 402(b), on the other hand, is entitled "Taxability of Beneficiary of Nonexempt Trust" and again provides that the amount distributed "shall be taxable to him in the year in which so distributed or made available, under section 72." This subsection is the natural corollary to section 402(a), but it is written in the context of the normal situation where an individual is taxed on income made available to him. Thus, the employer's contributions to a nonexempt trust are taxed currently to the "beneficiary." The "beneficiary" is therefore building up a basis in his account which is available to him to offset against any lump-sum distribution, thereby eliminating any distortion of taxable income even viewed from the perspective of the years over which the money was paid in.

Subsections (a) and (b) are internally consistent, each dealing with a different set of circumstances. Each is premised on the concept that it is the act of distribution that triggers a tax. Yet, in characterizing the distribution, as ordinary income or capital gain, one must relate the distribution to the set of circumstances which caused its creation. Any other interpretation would be much too narrow and would aid in frustrating Congress's

avowed purpose to make it possible for taxpayers to prepare for their own retirement.[5]

At issue here is a lump-sum distribution which is the result largely of contributions to an exempt trust but is also attributable in a stipulated amount to contributions to a trust nonexempt at the time of distribution as a result of the retroactive revocation of the exemption. Respondent would have us characterize the entire distribution, without regard to the tax status of the trust at the time of the contributions that formed the basis for the distribution, in terms of the trust's status at the later date. We do not consider it a happenstance that the trust was nonexempt at the time. We cannot conceive of respondent accepting, even in principle, the argument that the gain on any distribution from an exempt, but formerly nonexempt, trust is entitled to capital gain treatment.

We refuse to take an all-or-nothing approach. We have found no congressional mandate requiring such an approach. Absent such a mandate, we refuse to adopt a rule of law that would cause such inequities. The fact of the matter is that the largest portion of the amount at issue had its formation in contributions to an exempt trust, and it is no distortion to hold that therefore the stipulated portion of the distribution was made with respect to an exempt trust. The loss of an exemption should not convert existing qualified assets in an exempt trust to nonqualified assets in a nonexempt trust. To hold otherwise would create a rule of law that would penalize the innocent employee who had no say in the management of the trust and retroactively change the ground rules that he could fairly have anticipated would govern the taxability of payments to him.

The subsections are in agreement that the act of distribution is the event triggering a tax. Admittedly, Congress did not explicitly take care of the situation where a distribution is from a trust which had occupied both an exempt and nonexempt status at differing times. We believe that the subsections can be "harmonized" by holding that the tax character of the distribution, as distinguished from the timing of the imposition of the

---

[5]We are put in mind of Judge Learned Hand's statement in *Helvering v. Gregory*, "as the articulation of a statute increases, the room for interpretation must contract; but the meaning of a sentence may be more than that of the separate words, as a melody is more than the notes, and no degree of particularity can ever obviate recourse to the setting in which all appear, and which all collectively create." (69 F.2d 810, 811 (2d Cir. 1934).)

tax, is determined by the status of the trust at the time the contribution is made to it by the employer.

The second sentence of section 402(b) implies that Congress intended to prevent contributions, which were made to a nonexempt trust, from acquiring the benefits of an exempt trust at the time of distribution. Therefore, even if the nonexempt trust became a qualified trust in some later taxable year, the amount contributed in the earlier years would be taxable under section 402(b) as section 72 income in the year of distribution, an obviously appropriate result. However, and conversely, amounts contributed to a qualified trust should be treated as distributions from a qualified plan at the time of distribution.

Our conclusion that, once actually contributed, assets should retain their qualified nature is supported by the longstanding treatment of excess contributions to qualified plans. Since 1961, the regulations under section 404 have provided that excess contributions made to a profit-sharing plan, for example, in or for a taxable year for which the trust is exempt, are deductible in a following tax year of the trust under the provisions of section 404(a)(3)(A)—even if the trust is not exempt in those later year(s), or even if the trust had terminated. Sec. 1.404(a)–9(a), (b), and (e), Income Tax Regs. See also sec. 1.404(a)–3(a), –4(d), –6(b), and –13(a), Income Tax Regs. *Royer's, Inc. v. United States*, 265 F.2d 615 (3d Cir. 1959).

This approach is also analogous to that taken by the Commissioner in requalification of profit-sharing plans. Rev. Rul. 73–79, 1973–1 C.B. 194, discussed a profit-sharing plan that had been established prior to loss of its exemption. In the year following disqualification, the employer amended the plan to correct the defect. The Service ruled that the plan regained its exempt status as a result of the amendment. The ruling makes clear that nonqualified assets of the trust could remain in the trust after requalification. However, those assets would presumably be treated as employee contributions.[6] Therefore, the accounting thereof must be separate from the qualified assets.

Respondent's approach, it would appear, is to segregate the qualified from nonqualified assets in the area of requalification. However, respondent would have us bunch together all the

---

[6]See S. Simmons, "Dangers of Disqualification of Qualified Plans," 33 N.Y.U. Inst. on Fed. Tax. 507, 540 (1975).

assets of a distribution from a plan which subsequently became disqualified. This position may be inconsistent. While we reserve any decision with respect to the treatment of trust assets following a requalification, we hold that the assets in a distribution from a previously qualified plan should be separated. That part of the net distribution attributable to contributions to the trust, made prior to its disqualification, should be treated as a distribution from a qualified trust exempt from tax under section 501(a).

The retroactive revocation of the plan in the instant case was effective on April 1, 1973. Thus, the $22,842.59 attributable to contributions to the trust prior to that date should be treated as a distribution from a qualified trust and be entitled to capital gains treatment under section 402(a)(2).[7] The remaining part of the net distribution should be treated as a distribution from a nonexempt trust and taxed according to section 402(b).

Respondent's position would entitle certain participants in the plan to capital gain treatment while others received ordinary income treatment based solely on the date they terminated employment. Further, the "bunching effect" of respondent's approach would result in assets being taxed which otherwise would not be subject to tax because of their previous qualified status. As the Second Circuit said in *Greenwald v. Commissioner, supra,* such a "harsh" and inequitable result is neither required by statute nor expressed in the legislative history. Based upon the foregoing discussion we have, upon reflection, concluded that despite the factual differences between the instant case and *Epstein v. Commissioner, supra,* our rationale herein requires the determination that the decision in *Epstein* was erroneous, and hence, we will no longer follow it.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

CHABOT, *J.,* dissenting: The majority herein lead us down a new path in providing lump-sum distribution treatment to

---

[7] Petitioners were "active" participants in a qualified plan up to Apr. 1, 1973. Therefore, in the instant case, the denominator in the apportionment fraction of 402(a)(2) is the same as the numerator.

distributions from nonqualified plans—they bifurcate a single nonexempt trust into an exempt portion and a nonexempt portion. This bifurcation conflicts with the language of the statute, finds no support in the legislative history, waters down the Internal Revenue Code's protections for rank-and-file employees, and creates complicated allocation problems. Respectfully, I refuse to join the majority on their lump-sum distribution trip.

Section 402(b) (set forth in the majority opinion in n. 2 *supra*) provides that distributions from nonexempt trusts are to be treated under section 72, which generally provides ordinary income treatment. *The parties agree that the trust that made the distributions in the instant case was not exempt at the time any of the distributions in issue herein were made.* No other provision of the statute states an exception to, or modification of, section 402(b). The distributions herein should be taxed in accordance with the rules of section 402(b).

Section 402(a)(2) (set forth in the majority opinion in n. 1 *supra*) provides that, if certain requirements are met, then a distribution may be taxed in accordance with special rules which would result in long-term capital gain treatment for the bulk of the distributions in the instant case. One of the requirements stated in the statute is that the distributing trust *is* part of a qualified plan and *is* tax-exempt. The trust that made the distributions in the instant case was not part of a qualified plan and was not exempt when it made the distributions in issue herein. No other provision of the statute states an exception to, or modification of, this requirement that the distributing trust be exempt and be part of a qualified plan. The distributions herein should not be taxed in accordance with the rules of section 402(a)(2).

In the long history of the lump-sum distribution provisions,[1] the Congress gave no indication, in the statute or the legislative history, that a distribution from a nonexempt trust might be allocated as between exempt periods and nonexempt periods. On the other hand, the Congress has provided time-allocation rules

---

[1] These provisions were first enacted in sec. 162(a) of the Revenue Act of 1942 (Pub. L. 77-753, 56 Stat. 862), which amended sec. 165 of the Internal Revenue Code of 1939.

as to distributions from exempt trusts in both the Tax Reform Act of 1969[2] and the Employee Retirement Income Security Act of 1974.[3] If the Congress had intended a time-allocation rule on the point dealt with in the instant case, then the Congress could have enacted such a rule or in some other way indicated that such a rule was intended. The Congress has not done so. Neither the statute nor the legislative history allows us room to create such a rule merely because the majority herein believe it would be more "equitable."

The majority herein create the concept of bifurcation of a single nonexempt trust into a qualified trust with "qualified assets" and a nonexempt trust with "nonqualified assets." This is avowedly a rule of broad application regardless of "who did what" (majority opinion at p. 782 *supra*), created because of the majority's view that otherwise the law "would penalize the innocent employee who had no say in the management of the trust" (majority opinion at p. 784 *supra*). With all due respect, I must conclude that the majority are engaged in unauthorized revisionism.[4] They seek to weigh the probable effects of their view of what a properly drafted statute would have provided, against the probable effects of the statute that the Congress in fact enacted. In doing so, the majority proceed without the public hearings generally available to the Congress, without examination by another House or a committee of conference, and without examination by a President deciding whether to sign or veto a bill. The majority proceed without statistical or other analyses of effects.

The majority ignore the fact that in every case that has come before us in which this issue has arisen at any stage (the instant case; *Greenwald v. Commissioner*, 366 F.2d 538 (2d Cir. 1966), revg. in part 44 T.C. 137 (1965); *Epstein v. Commissioner*, 70 T.C. 439 (1978)), the petitioner-employee was a decision maker and not one of the rank and file that the majority herein seek to

---

[2] Sec. 515 of Pub. L. 91–172, 83 Stat. 643.

[3] Sec. 2005 of Pub. L. 93–406, 88 Stat. 987.

[4] See *United States v. Rutherford*, 442 U.S. 544 (1979), where the Supreme Court, in a different context, noted that "Under our constitutional framework, federal courts do not sit as councils of revision, empowered to rewrite legislation in accord with their own conceptions of prudent public policy. See *Anderson v. Wilson*, 289 U.S. 20, 27 (1933). Only when a literal construction of a statute yields results so manifestly unreasonable that they could not fairly be attributed to congressional design will an exception to statutory language be judicially implied. See *TVA v. Hill*, 437 U.S. [153], at 187–188 [1978]."

protect. They ignore the implications of the fact that in the instant case, the plan lost its qualified status because "benefits were forfeited on partial termination of the plan and funds were diverted to purposes other than for the exclusive benefit of the participants" (majority opinion at p. 781 *supra*). These acts by the plan's decision makers appear to be violations of section 401(a)(7)[5] and the opening language of section 401(a),[6] legislation enacted to protect the rank and file. The majority herein ignore the fact that the lesson of their opinion is that a decision maker who wishes to enhance his own fortune as a plan participant[7] or as owner of the employer[8] can do so with no risk of substantial loss of tax benefits (i.e., the decision maker who happens to get caught, as in the instant case, can still withdraw from the plan most of his account as a tax-favored lump-sum distribution).

The responsible employer will no doubt continue to adhere to the statute's requirements and the congressional concern for rank-and-file employees, but those who wish to divert as much as possible of their employees' plan assets from the rank and file will find that the majority's opinion affords them a valuable tool for tearing great holes in the protective scheme of sections 411(d)(3) (see n. 5 below) and 401(a). Indeed, the majority, by stressing the irrelevance of how the exemption may have been lost, and by specifically overruling *Epstein* (majority opinion at p. 786 *supra*), have pointed the way to great flexibility in so diverting assets. One need merely amend the plan to give the decision makers the necessary authority to make the diversion. The plan assets then may be withdrawn with only the minimal

---

[5]SEC. 401. QUALIFIED PENSION, PROFIT-SHARING, AND STOCK BONUS PLANS.

(a) REQUIREMENTS FOR QUALIFICATION.— * * *

\* \* \* \* \* \* \*

(7) A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that, upon its termination or upon complete discontinuance of contributions under the plan, the rights of all employees to benefits accrued to the date of such termination or discontinuance, to the extent then funded, or the amounts credited to the employees' accounts are nonforfeitable. * * *

This provision was repealed by sec. 1016(a)(2)(C) of Pub. L. 93–406, 88 Stat. 929, but substantially the same language was placed by sec. 1012(a) of that act (88 Stat. 901, 912) into sec. 411(d)(3) of the Code.

[6]SEC. 401. QUALIFIED PENSION, PROFIT-SHARING, AND STOCK BONUS PLANS.

(a) REQUIREMENTS FOR QUALIFICATION.—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

[7]By forfeitures allocated to fully vested decision makers, on the Tontine principle.

[8]By forfeitures in pension plans or by use of plan assets for the benefit of the employer rather than the benefit of the participants.

tax sanctions promised by the majority without regard to "who did what." And all of this is done, the majority tell us, in the name of protecting the rank and file.

The Congress has not been unmindful of the often-harsh effects of loss of exempt status. In the last decade, the Congress has explored methods of focusing sanctions more sharply and measuring them more appropriately to the violations.[9] As to employees' plans, the Congress took a number of steps along this line in the Employee Retirement Income Security Act of 1974.[10] Other attempts were made in the vesting area,[11] but the Congress—after further considering the matter—concluded that it had not yet found an appropriate solution and so left the sanction for insufficient vesting as loss of exempt status.

The attempt of the majority herein to alleviate by fiat the alleged "harshness" and "inequity" of the statute (see majority opinion at p. 786 *supra*) may be as wide of the mark as the attempt portrayed in Gilbert and Sullivan's "Mikado" to "let the punishment fit the crime." See "The Complete Plays of Gilbert and Sullivan," at 382–384 (Random House, Inc.).

The majority herein seek to supply an alleged omission in the statute, on the basis of no examination of alternatives, no opportunity for public comment, and no articulation of the method by which the time-allocation of assets is to be made. The majority state that they follow the Court of Appeals opinion in *Greenwald*. However, the Court of Appeals at least provided a workable method for making the allocation in a defined contribution plan. In *Greenwald*, the Court of Appeals allowed long-term capital gain treatment only to the amount in Mr. Greenwald's account as of the date the trust therein lost its

---

[9]In the Tax Reform Act of 1969, several excise taxes, some imposed on the person responsible for the violation, replaced the loss-of-exemption provisions of former secs. 503 and 504 in the case of private foundations. See H. Rept. 91–413 (Part 1) pp. 20–40, 1969–3 C.B. 200, 214–226; S. Rept. 91–552, pp. 28–56, 1969–3 C.B. 423, 442–460; H. Rept. 91–782 (Conf.) pp. 278–288, 1969–3 C.B. 644–651.

In the Tax Reform Act of 1976, similar steps were taken with respect to the "excess lobbying" provisions that had been in the statute since 1934. See H. Rept. 94–1210, (to accompany H.R. 13500), pp. 7–8, 1976–3 C.B. (Vol. 3) 31, 37–38; S. Rept. 94–938 (Part 2) pp. 79–80, 1976–3 C.B. (Vol. 3) 643, 721–722; S. Rept. 94–1236 (Conf.) pp. 532–533, 1976–3 C.B. (Vol. 3) 807, 936–937.

[10]In particular, the Congress established separate taxes as to excess contributions to "H.R. 10 plans" (sec. 4972, replacing loss-of-exemption provisions of former sec. 401(d)(8)), and self-dealing (sec. 4975, replacing the loss-of-exemption provisions of former sec. 503). Also, the Congress established separate taxes as to underfunding (sec. 4971), replacing provisions in Treasury regulations (sec. 1.401–6(c)(2), Income Tax Regs.) that treated underfunding as a discontinuance of the plan.

[11]See sec. 241(a) of the Senate amendment to H.R. 2, which became the Employee Retirement Income Security Act of 1974. That section of the Senate amendment would have added a new sec. 4973 to the Code entitled "Taxes on Failure To Meet Minimum Vesting Standards."

exempt status. The balance of the distribution to Mr. Greenwald was given ordinary income treatment, without regard to whether this balance consisted of (a) subsequent employer contributions or (b) subsequent earnings on either (1) the previous balance or (2) the subsequent employer contributions. In the instant case, the majority appear to provide the favored tax treatment to some part of the earnings after the trust lost its exempt status. The majority offer no explanation for this deviation from the *Greenwald* rule nor guidance for the next case. The majority, not faced with a case involving a defined benefit plan, also have given us no clue as to how their universal rule is to allocate assets in the case of such a plan. Is it to be on the basis of the time of employer contributions? the value, as of the date of the loss of exempt status, of the benefits accrued as of that date? the date-of-distribution value of benefits accrued as of the date of loss of exempt status? True, it is not required that any one case present the world with a neatly phrased uniform field theory, but when the majority stress the universality of their approach, one might have expected them to provide some clues as to how they wish the job to be accomplished.

The majority stress their concern that we must pay attention to the "melody" of the statute, in quoting Judge Learned Hand (majority opinion in n. 5 *supra*). Regrettably, the majority appear to have listened to the melody, not of the statute, but of a siren song, and they have done so without taking the precautions that Odysseus took. The wreckage created by this decision is apt to foul up the already-complicated lump-sum distribution area for a long time to come, putting rank-and-file employees' unvested benefits beyond the protection of the Internal Revenue Code. As in Odysseus' case, the master of the ship may gain the pleasure of hearing the sirens' song; however, many a deck hand will, I fear, find his or her retirement voyage wrecked on the rocks to which his or her employees' plan has been drawn by the majority herein.

TANNENWALD and SIMPSON, *JJ.*, agree with this dissenting opinion.