ALLEN LUDDEN AND BETTY WHITE LUDDEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2992–76.    Filed August 31, 1977.

*Barney B. Shiotani* and *Joel M. Butler,* for the petitioners.
*Richard W. Kennedy,* for the respondent.

OPINION

Scott, *Judge:* Respondent determined a deficiency of $26,917 in petitioners' Federal income tax for the calendar year 1972. The sole issue for decision is whether amounts contributed on behalf of each petitioner to pension and profit-sharing plans of their wholly owned corporation should be included in petitioners' taxable income because of failure of the plans to qualify under section 401(a), I.R.C. 1954.[1]

All of the facts have been stipulated and are found accordingly. ·

Petitioners, husband and wife, who resided in Los Angeles at the time of the filing of the petition in this case, filed a joint Federal income tax return for the calendar year 1972 with the Internal Revenue Service Center, Los Angeles, Calif. Petitioners keep their books and records and file their income tax returns on the cash basis method of accounting.

Petitioners, during the period here involved, were officers of and each owned one-half of the outstanding stock of Albets Enterprises, Inc. (Albets), a corporation organized under the laws of California in 1966. Albets uses the cash basis method of accounting and has a fiscal year ending July 31. In 1967 Albets adopted a profit-sharing plan and trust for the benefit of its employees, and on October 6, 1967, the District Director of Internal Revenue issued a determination letter to Albets · holding that the plan met the requirements of section 401(a) and that the trust was exempt from income tax under section 501(a). In 1968 Albets adopted a money purchase pension plan and trust. On November 29, 1968, the District Director of Internal Revenue issued a determination letter to Albets holding this plan to meet the requirements of section 401(a) and the trust to be exempt from tax under section 501(a).

Both the profit-sharing and pension plans adopted by Albets provided for participation by all persons employed on a permanent, full-time basis as of the dates of adoption of the plans. Permanent, full-time employees hired subsequent to the dates of adoption were to become eligible to participate upon completion of 1 year of service. Amounts contributed by Albets to the plans were to be allocated to an account for each

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the year in issue.

participating employee in accordance with the ratio that the total regular compensation paid by Albets to that employee during the year bore to the total regular compensation paid to all participating employees during the year. Further, the plans provided that at the end of the year each participating employee would have a vested interest in 100 percent of the amount allocated to his account during that year. Additional provisions governed retirement and death benefits, forfeitures upon discharge, and benefits upon resignation prior to retirement.

Article VI of each plan provided for administration of the plans by a three-person managing committee designated by the company's board of directors. The committee so designated consisted of the petitioners herein and Edward Traubner, the owner of Edward Traubner & Co., Inc. (hereinafter the Traubner firm), an accounting firm. The managing committee delegated to Mr. Traubner the responsibilities for determining which employees were eligible to participate in the plans and for determining the proper allocations of Albets' contributions among the employees' accounts. Mr. Traubner, in turn, delegated these duties to Wilbur Hoffman, an employee of the Traubner firm.

In 1970 Albets began production of a television series, "The Pet Set." Albets hired several employees in conjunction with this series, all but one of whom were discharged in May or June of 1972 when "The Pet Set" was discontinued. The one employee not discharged was Kathy Whitehead, a production secretary, who arranged with petitioner Allen Ludden to continue in Albets' employ at an annual salary of $7,275. Ms. Whitehead was not an officer of Albets. Having completed a full year's service with Albets during its fiscal year ended July 31, 1972, Ms. Whitehead became eligible for the first time to participate in Albets' pension and profit-sharing plans during Albets' 1972 fiscal year.

Two separate sets of books were maintained for Albets. One set was kept by the William Morris Agency, which collected the income and paid out the production expenses of the television series. The second set of records was kept by Mr. Hoffman of the Traubner firm. The books maintained by the William Morris Agency disclosed that Ms. Whitehead was still an Albets employee at the close of Albets' fiscal year ended

July 31, 1972. On some records kept by the Traubner firm, Ms. Whitehead was carried as an Albets employee. The firm prepared the payroll tax returns for Albets for the period ended June 30, 1972, which returns showed Ms. Whitehead as an employee of Albets. However, the records that were kept by Mr. Hoffman did not list Ms. Whitehead as an employee, but showed that Allen Ludden, whose salary was $135,000, and Betty White Ludden, whose salary was $78,000, were Albets' only employees at the end of Albets' fiscal year 1972. Mr. Hoffman had no knowledge that Ms. Whitehead had not been terminated in May or June 1972 along with all the other "Pet Set" employees. Accordingly, he determined that for Albets' fiscal year ended July 31, 1972, the only persons eligible to participate in the profit-sharing and pension plans were the petitioners. Mr. Hoffman directed the trustee, City National Bank, to allocate Albets' $53,250 contribution between petitioners' accounts,[2] with nothing allocated to an account for Ms. Whitehead. Before the previous year's error was discovered, Albets made a proper contribution to the plans on Ms. Whitehead's behalf for fiscal year 1973.

Upon an audit by the Internal Revenue Service, the error in administration of the plans was discovered. Mr. Hoffman, at the direction of Mr. Ludden, offered to rectify the error by reallocating Albets' 1972 contribution, with a portion thereof going to an account for Ms. Whitehead,[3] but this reallocation was never made. Respondent determined that because no contribution was allocated to Ms. Whitehead, the Albets plans did not qualify for Albets' fiscal year 1972 under section 401(a) and that Albets' contribution of $53,230 was includable in petitioners' gross income for the calendar year 1972.

Section 401(a) sets forth the requisites for qualification for tax exemption of a trust forming a component part of an employee pension or profit-sharing plan. If a trust qualifies under section 401(a), contributions thereto on behalf of employees are not includable in the employees' incomes until the year they are actually distributed or made available to

---

[2] $33,750 was allocated to petitioner Allen Ludden's account, and $19,500 was allocated to petitioner Betty White Ludden's account.

[3] Mr. Hoffman proposed to reallocate the $53,250 contribution as follows: $32,635.35 to petitioner Allen Ludden's account; $18,855.97 to petitioner Betty White Ludden's account; and $1,758.68 to Kathy Whitehead's account.

them. Sec. 402(a)(1). On the other hand, if the trust fails to qualify under section 401(a), whether employer contributions are to be included in the employees' incomes is determined in accordance with section 83. Sec. 402(b).

The qualified status of a trust under section 401(a) depends, in part, upon the presence or absence of certain features in the employee plan of which the trust forms a part. Under section 401(a)(3),[4] a trust will not qualify for tax exempt status unless the accompanying plan provides benefits to either a stated percentage of all full-time employees or to a group of employees within a classification found by respondent not to be discriminatory in favor of officers, shareholders, supervisors, or highly compensated employees—the so-called "prohibited group." Section 401(a)(4)[5] requires that a qualifying employee plan must not discriminate in contributions or benefits in favor of members of the prohibited group.

It is clear that the Albets plans as written met the requirements of section 401(a), and respondent does not

---

[4] Sec. 401(a) as applicable to the year 1972 provided in part as follows:
SEC. 401. QUALIFIED PENSION, PROFIT-SHARING, AND STOCK BONUS PLANS.

(a) REQUIREMENTS FOR QUALIFICATION.—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—
* * *.

(3) if the trust, or two or more trusts and annuity plan or plans are designated by the employer as constituting parts of a plan intended to qualify under this subsection which benefits either—

(A) 70 percent or more of all the employees, or 80 percent or more of all the employees who are eligible to benefit under the plan if 70 percent or more of all the employees are eligible to benefit under the plan, excluding in each case employees who have been employed not more than a minimum period prescribed by the plan, not exceeding 5 years, employees whose customary employment is for not more than 20 hours in any one week, and employees whose customary employment is for not more than 5 months in any calendar year, or

(B) such employees as qualify under a classification set up by the employer and found by the Secretary or his delegate not to be discriminatory in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees; and

(4) if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees.

[5] See n. 4 supra.

contend to the contrary. Rather, respondent takes the position that, even though Albets' written plans satisfied the statutory provisions, they were not qualified during Albets' fiscal year 1972 because the contribution actually made in that year discriminated in favor of highly compensated officers in violation of sections 401(a)(3)(B) and 401(a)(4) and failed to meet the minimum coverage provisions of section 401(a)(3)(A).

In order for a plan to be considered qualified, not only its terms but also its operations must meet the statutory requirements. *Quality Brands, Inc. v. Commissioner*, 67 T.C. 167, 174–175 (1976). Sec. 1.401–1(b)(3), Income Tax Regs. The record here shows that for the fiscal year 1972 the Albets plans in operation failed to meet the requirements of section 401(a)(3)(A) of minimum coverage and contravened the nondiscrimination provision of sections 401(a)(4) and 401(a)(3)(B).

In 1972 contributions were made on behalf of only two of Albets' three eligible employees. Consequently, the 70–80-percent minimum coverage requirements of section 401(a)(3)(A) were not met. Moreover, petitioners' status as officers, shareholders, and highly compensated employees clearly makes them members of the "prohibited group." As the only contributions were made for their benefit, the nondiscrimination requirements of sections 401(a)(3)(B) and 401(a)(4) were likewise contravened. Petitioners recognize that in operation the Albets plans violated these statutory provisions, but argue that because the violations were caused by an inadvertent administrative error which they, the officers of Albets, are willing to correct, the plans should be held to be qualified in 1972.

Petitioners rely on *Time Oil Co. v. Commissioner*, 258 F.2d 237 (9th Cir. 1958), remanding 26 T.C. 1061 (1956). That case involved the issue of whether demand notes of an employer constituted payment by that employer to a stock bonus plan as well as the issue of qualification of the plan. The Circuit Court held that where an approved plan provided payment by the company to the trustees in cash or preferred stock of the company, the issuance by the company of non-interest-bearing demand notes for which the company later substituted preferred stock back dated to the dates of the notes was not a sufficient violation of the terms of the plan to cause

disqualification. The Court reasoned that the deviation from the terms of the plan neither benefited the employer nor harmed the employees. The Court considered the issuance of the demand notes to constitute payment and allowed the taxpayer company a deduction for its contribution of the notes to the plan stating (at page 239):

> Here while hard justice might befit Time Oil Company's officers, yet prospective consequences of injury to the employees from the commissioner's position here are quite possible as contrasted with the lack of injury shown to them in the shortcomings of the errant taxpayer. [Fn. ref. omitted.]

Thus, not only was the type of deviation in the *Time Oil Co.* case different from that in the instant case, but, more importantly, no harm resulted from Time Oil's deviation from its plan. Here, by contrast, the deviation did result in injury to an employee. Ms. Whitehead was denied benefits to which she was clearly entitled by the Albets plans. Furthermore, in the *Time Oil* case the taxpayer company voluntarily rectified its deviation even though the Commissioner had not allowed it a deduction for its contributions.

The Court of Appeals for the Ninth Circuit recently considered the question whether innocent deviations from the terms of employee plans should constitute a basis for disqualification under section 401(a) in a case very similar to the instant case. *Myron v. United States,* 550 F.2d 1145 (9th Cir. 1977).

In the *Myron* case, five eligible employees were excluded from coverage in an employee plan for 2 consecutive years. The company's contributions were allocated only to the account of the corporation's sole shareholder. The District Court found as a fact that the exclusion was inadvertent, but nevertheless concluded that this innocent error justified disqualification. *Myron v. United States,* 382 F.Supp. 590 (C.D. Cal. 1974). In affirming, the Court of Appeals agreed that even an inadvertent failure in coverage could be a proper basis for denying qualification.

We do not read the *Myron* case as holding that under no circumstances could an operational defect be overlooked or that absolute letter-perfect administration of employee plans is a prerequisite to qualification. When the deviation from the terms of the plan results in no harm to anyone and is

voluntarily corrected by the parties themselves, it might be that the deviation would not be sufficiently substantial to disqualify the plan. When, however, as in *Myron* and in this case, benefits are denied every nonmember of the prohibited group, disqualification should result.[6]

---

[6] The only other case that we have found concerning inadvertent errors in the operation of an employee plan is *Ray Cleaners, Inc. v. Commissioner*, 27 T.C.M. 23, 37 P-H Memo. T.C. par. 68,006, p. 68–32 (1968). In that case, involving the years 1962, 1963, and 1964, with facts quite different from those in the instant case, we stated (at page 28):

"Finally, it is true that in 1964, petitioner inadvertently failed to invite 3 eligible employees to participate. We do not think, however, that an inadvertent omission disqualifies a plan."

Since in *Ray Cleaners, Inc.* the qualified employees were not all either officers, stockholders or highly paid, and the facts do not show whether the inadvertent error had been voluntarily corrected, in our view it is not persuasive authority in support of petitioners' position. In *Myron v. United States*, 550 F.2d 1145 (9th Cir. 1977), the court stated with respect to the *Ray Cleaners* case:

"Appellant cites *Ray Cleaners, Inc. v. Commissioner*, 27 T.C.M. 23 (1968) for the proposition that disqualification is not proper in situations where an inadvertent error causes employees to be omitted from coverage. However, the facts in that case differ significantly from the facts in the instant case. In *Ray Cleaners*, the plan had operated for two years without error. During those years three employees were covered, four declined to participate, and approximately twenty (20) employees were not eligible for coverage. In the third year of operation, three more employees became eligible but were inadvertently omitted from coverage. The important distinctions are that the Ray Cleaners plan had operated properly before the error occurred, that under the Ray Cleaners plan all seven (7) eligible employees were offered coverage initially, and that those employees actually covered included two who were low salaried.

"While it might seem harsh to deny retroactive qualification of any plan where a claim of innocence had been accepted, this Court is not prepared to say that consideration of the degree of failure, even innocent failure in coverage is an improper basis for denying qualification."

The concurring opinion stated as follows:

"I concur in the judgment. Contrary to the situation in *Ray Cleaners, Inc.* 27 T.C.M. 23 (1968), in this case the pension plan in operation was discriminatory. The district court so found and I agree. There is no basis in the Internal Revenue Code for retroactive correction of such plans."

The dissent stated:

"The above notwithstanding, I cannot with firm conviction hold that *Ray Cleaners* offers convincing support that our court errs in affirming the judgment of the District Court. This is because the Tax Court did not expose its reasoning as to why it did not consider the inadvertent discrimination in *Ray Cleaners* to be fatally defective. Obviously, that which disturbs and troubles me about the Commissioner's determination is the wholly different treatment accorded to plans with provisions defective because of conceded inadvertence. 26 U.S.C. sec. 401(b); *Aero Rental v. Commissioner*, 64 T.C. 331 (1975). True, there is [sic] no comparable statutory provisions governing the cure of a plan's operational defects; nonetheless, there remains the question whether the Commissioner acts reasonably by refusing to draw a seemingly appropriate analogy, i.e., considering the extremely liberal avenue for retroactive cure of a plan originating with defects due to inadvertence and applying that remedy in the context of operational defects arising from innocent inadvertence."

In the *Myron* case, the Court stated that the "IRS rejected appellant's offer to cure the discrimination retroactively." The taxpayer in *Myron* apparently conditioned its offer on an assurance of favorable tax treatment if the cure were effectuated. The mistake in administration was never corrected. In the instant case petitioners likewise offered to have Albets correct the error in operation by having the trustee reallocate Albets' 1972 contribution to the trust so that a portion would go to an account for Ms. Whitehead. Respondent, they claim, "rejected said offer," and no reallocation was ever made. Petitioners offer no reason as to why they considered it necessary to obtain respondent's permission to reallocate. They put forth no explanation why Albets, with petitioners' consent, could not have requested the trustee to go forward with the reallocation without seeking respondent's permission. The indication is that petitioners' "offer," like that in *Myron,* was conditioned upon an ·agreement by respondent to hold the plans qualified under section 401(a) if a retroactive reallocation were made. While petitioners concede that Ms. Whitehead should have received benefits under the Albets plans in 1972, they are apparently unwilling to give her the benefits that she is due unless they can reap the tax advantages flowing from a plan qualified under section 401(a).

Petitioners contend that respondent's refusal to rule the plans qualified upon retroactive reallocation is arbitrary and unreasonable. There is no provision in the Internal Revenue Code governing the retroactive correction of errors in the administration of employee plans.[7] We therefore have no statutory criteria for determining under what circumstances, if any, respondent might be considered to have abused his discretion in refusing to deem a plan qualified if a retroactive correction of an inadvertent error in its operation were made. The record here is clear that no such correction was in fact made. Therefore, we reserve our judgment on the question whether and under what circumstances respondent would be justified in refusing to confer qualified status on a plan when an inadvertent error in administration, such as the one involved in this case, had been in fact voluntarily rectified by

---

[7] *See,* however, sec. 401(b), which allows retroactive effect of amendments to the *terms* of employee plans.

those charged with operating the plan. This Court has no power to compel petitioners to reallocate Albets' 1972 contribution. The exclusion of Ms. Whitehead from participation in the plans in 1972 was clearly discriminatory and, given petitioners' failure to correct their error themselves, we sustain respondent's findings that Albets' trusteed plans failed to qualify under section 401(a) and that the trusts were not exempt from tax under section 501(a).

The final question to be decided is whether the amounts allocated to petitioners' accounts in 1972 were subject to a "substantial risk of forfeiture" within the meaning of section 83.[8] Section 402(b) governs the question of includability in an employee's gross income of contributions to a nonexempt trust. This section provides that contributions to such trusts are includable in accordance with the rules of section 83. Section 83,[9] in pertinent part, provides that property transferred to an individual in connection with his performance of services is includable in the individual's gross income in the

---

[8] The stipulated facts are not clear on this point but indicate that the deduction for the contribution to the plans by Albets was not disallowed, presumably because respondent considered such deduction proper as additional compensation to the Luddens.

[9] SEC. 83. PROPERTY TRANSFERRED IN CONNECTION WITH PERFORMANCE OF SERVICES.

(a) GENERAL RULE.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.

* * *

(c) SPECIAL RULES.—For purposes of this section—

(1) SUBSTANTIAL RISK OF FORFEITURE.—The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual.

first year when the individual's rights in the property are not subject to a "substantial risk of forfeiture."

The plans in this case provided that each employee had a vested interest of 100 percent in the amount allocated to his account at the end of each year of employment. Article IV, section 4, of both plans provided:

Section 4. If a participating employee has been discharged by the Company for cause, such as any intentional act of proven dishonesty or any other intentional act which would injure the Company, such participating employee shall forfeit the entire amount allocated to his account, whether or not any part thereof shall have been previously vested, and he shall be entitled to no benefits under this Plan. The Committee shall determine, on the basis of facts given to it by the Company, whether the discharge of a participating employee is for cause. A discharged participating employee shall have the right, within ten (10) days after being notified by the Committee that he has been discharged for cause, to request arbitration of the matter. * * *

We hold that the probability that either of the petitioners would be discharged for cause from their wholly owned corporation, thereby forfeiting benefits under the Albets plans, is too remote to constitute a substantial risk of forfeiture.[10]

*Decision will be entered for the respondent.*

---

[10] This holding is consistent with Proposed Income Tax Reg. sec. 1.83–3(c), which provides in pertinent part:

Sec. 1.83–3 [Proposed Income Tax Regs.] Meaning and use of certain terms.— * * *

(c) *Substantial risk of forfeiture*—* * * Rights in property transferred to an employee (or beneficiary thereof) of a corporation who owns, directly or indirectly, more than 5 percent of the total combined voting power or value of all classes of stock of the employer corporation or of its parent or subsidiary corporation will not be considered subject to a substantial risk of forfeiture unless the possibility that the employee will not satisfy the requirement claimed to result in such risk is substantial; in determining whether the possibility is substantial, there will be taken into account (i) the employee's relationship to other stockholders and the extent of their control, potential control and possible loss of control of the corporation, (ii) the position of the employee in the corporation and the extent to which he is subordinate to other employees, (iii) the employee's relationship to the officers and directors of the corporation, (iv) the person or persons who must approve the employee's discharge, and (v) past actions of the employer in enforcing the provisions of the restrictions. * * *