JOHN U. FAZI AND SYLVIA FAZI, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 13139–91.                    Filed May 19, 1994.

*Paul A. Kasicky, James E. Abraham,* and *Robert V. Campedel* (specially recognized), for petitioners.
*Julia L. Wahl,* for respondent.

GERBER, *Judge*: Respondent determined a $434,582 deficiency in petitioners' 1987 Federal income tax. The deficiency is attributable to distributions petitioners received from a pension plan. The issues for our consideration are: (1) Whether the pension plan and related trust were unqualified at the time of the distributions to petitioners;[1] and (2) if the plan and trust were unqualified, whether attempted rollovers to individual retirement accounts resulted in a taxable event for petitioners and, if so, we must decide the amount of the distribution which is taxable in the year 1987.

### FINDINGS OF FACT

The parties have stipulated facts and documents which are incorporated by this reference. Petitioners resided in Weirton, West Virginia, when the petition was filed in this

---

[1] The parties attempted to consolidate this deficiency proceeding with a declaratory judgment case involving the qualification of the subject pension plan (docket No. 13167–91R). Due to certain procedural concerns, the declaratory judgment case was not consolidated; instead it was assigned to the same division of this Court, along with a second related declaratory judgment case (docket No. 13277–91R), to facilitate the outcome of the declaratory judgment cases in accord with the outcome of this deficiency case. In that regard, prerequisite to determining whether petitioners are liable for an income tax deficiency, we must decide whether the said pension plan was qualified, the identical issue which will govern the outcome of the declaratory judgment cases. Further, the parties stipulated and offered the administrative record from the declaratory judgment case, which has been received as part of the record in this deficiency proceeding.

case. Petitioner John U. Fazi (Mr. Fazi), a dentist, was the sole shareholder, president, and only member of the board of directors of Dr. J.U. Fazi, Dentist, Inc. (corporation), until it was dissolved. As president, he was charged with the supervision and control of the business and affairs of the corporation.

The corporation established and operated three employee pension benefit plans, as follows: (1) The Dr. J.U. Fazi, Dentist, Inc. Employees Pension Plan (plan 1); (2) a money purchase pension plan—the Dr. J.U. Fazi, Dentist, Inc., Employee Profit Sharing Plan (plan 2); and (3) the Dr. J.U. Fazi, Dentist, Inc., Retirement Plan—a defined benefit pension plan (plan 3). This case mainly addresses the establishment and maintenance of plan 1.

Plan 1 was based upon a prototype trusteed money purchase plan developed by General American Life Insurance Co. (General). Plan 1 was adopted by the corporation during February 1972 by means of the corporation's execution of a joinder agreement. When adopted, plan 1 was qualified under section 401,[2] and the accompanying trust was a qualified, tax-exempt trust[3] under section 501. Throughout the existence of plan 1, it has been administered by the corporation through the advice and assistance of independent pension consultants, other than General. Mr. Fazi had little specialized knowledge about pension plans, and he relied upon various consultants to insure that the pension plans conformed with all requirements, including compliance with the tax laws. The consultants were responsible for the design, implementation, and administration of plan 1. Agreements and forms involving the pension plans were prepared by the consultants and were executed by Mr. Fazi in his official capacity. The plan 1 prototype was amended by General during September 1977, November 1979, and August 1982, and new joinder agreements were executed on behalf of the corporation in each instance. Following the amendments and

---

[2] Section references are to the Internal Revenue Code in effect for the periods under consideration. Rule references are to this Court's Rules of Practice and Procedure.

[3] Throughout the statutes, regulations, and related case opinions, the terms "qualified" and "exempt" have occasionally been used synonymously, and the terms "unqualified" and "nonexempt" have also been synonymously used. For convenience, the terms "qualified" and "unqualified" may be used in situations where they refer to or modify the employee trust, rather than the plan.

the execution of each new agreement, plan 1 and the accompanying trust continued to be qualified.

Mr. Fazi's interest in plan 1 was 100 percent vested in all relevant years. Petitioner Sylvia Fazi's (Mrs. Fazi) interest in plan 1 was 30 percent vested for 1984, 60 percent vested for 1985, 80 percent vested for 1986, and 100 percent vested for 1987. Plan 2 was merged into plan 1 during May 1986, resulting in a $277,138 increase in Mr. Fazi's plan 1 account.

Following the enactment of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97–248, 96 Stat. 324; the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98–369, 98 Stat. 494; and the Retirement Equity Act of 1984 (REA), Pub. L. 98–397, 98 Stat. 1426, General developed a new prototype plan and received a favorable determination regarding the prototype from the Internal Revenue Service on April 14, 1986. Pension plan consultants made Mr. Fazi aware of the changes in the tax law during 1982 and 1984. Several meetings were held between Mr. Fazi and the consultants to discuss changes, including concerns about "topheavy plans" generated by the 1984 tax law amendments. Mr. Fazi was made aware that his plan was top-heavy, and modifications were being made to remedy that problem. After various meetings and discussions with the consultants, Mr. Fazi believed that the plans had been changed to comply with the tax law changes. General prepared a joinder agreement for purposes of adoption of the restated prototype plan that had been modified to comply with TEFRA, DEFRA, and REA (restated post-TEFRA prototype).[4] Under the September 1972 prototype plan agreement, as between General and the corporation, adoption and a contractual relationship would exist only upon the "execution of a joinder agreement by the Employer and Trustee and accepted by the Insurer." Similarly, General's restated post-TEFRA prototype plan provided that "This Plan and Trust shall constitute a trusteed Plan for the Employer when adopted by the execution of a joinder agreement by the Employer and Trustees."

The prototype plan is a homogeneous basic plan which provides the foundation for the adoption of a plan by an

---

[4] Use of the shorthand term "post-TEFRA" in this opinion is intended to denote that all pertinent acts, including TEFRA, DEFRA, and REA, are being considered.

employer. The joinder agreement is the document by which employers embody specialized information and details that permit the prototype plan to fit the needs of a specific employer's plan, including the setting of limits and terms in order to cause a plan to comply with the legal and regulatory requirements. The joinder agreement must be completed by the employer and includes a place for the employer to supply the effective date of the restated plan; the month and day the plan year begins and ends; the anniversary date of the plan year; the normal retirement age; the definition of compensation; integration levels; eligibility requirements; definition of employer and employee contributions; establishing the "limitation year" within the meaning of section 415; definition of topheavy minimum contributions; vesting; and other aspects of the plan. Under the restated post-TEFRA prototype plan, General required for the first time that adopting employers pay a fee for using the restated prototype.

A joinder agreement for the restated post-TEFRA prototype plan with General was not executed on behalf of the corporation, the various plans, or General, and no fee was paid to General in connection with the restated post-TEFRA prototype plan. Prior to mid or late 1987, neither Mr. Fazi nor the consultants possessed a restated post-TEFRA prototype for plan 1. In addition, within the same timeframe, Mr. Fazi and the plan consultants did not possess a joinder agreement for the corporation reflecting the adoption of General's restated post-TEFRA prototype plan. The corporation did not request or receive a determination letter from respondent in connection with the restated post-TEFRA prototype plan.

In early 1986, Mr. Fazi obtained a copy of a letter from General which advised him of the restated post-TEFRA prototype plan and also served as notice that prototype plan users needed to amend their plan and might need to request a status determination from the Internal Revenue Service no later than April 30, 1987. It was Mr. Fazi's usual practice to forward any materials from General to the pension plan consultants with directions to handle the matter. Mr. Fazi believed that he had done so regarding this letter and/or any materials from General.

In the latter part of 1986, Mr. Fazi took action to terminate plan 1, distribute the assets, and dissolve the corporation. In connection with the termination, the pension consult-

ant by a letter dated June 12, 1987, supplied various documents and inquired whether Mr. Fazi had received an updated plan document from General and apprised him of the importance of supplying a copy for the consultant's records. This was the first time that Mr. Fazi became aware of the possibility of missing plan documents.

Following dissolution of the corporation on December 31, 1986, plan 1 was terminated on November 10, 1987, and the assets of the trust associated with plan 1 were distributed to plan participants, including petitioners. Within 60 days, petitioners rolled over their distributions, totaling $1,128,785.16 ($1,110,300.24 for Mr. Fazi and $18,484.92 for Mrs. Fazi), into individual retirement accounts (IRA). The total paid out to all employees, including petitioners, was $1,358,990.91. Petitioners' distributions represented about 83 percent of the total distributions to all employees. During 1989, respondent questioned the qualification of the plans for failure to amend and petitioners' 1987 tax liability regarding the distribution of the plan's assets. By a letter dated August 4, 1989, respondent proposed to disqualify the plans for the 1985, 1986, and 1987 years. Respondent determined that the distributions to petitioners were taxable income to them for 1987 because plan 1 had become disqualified due to failure to adopt and maintain a written plan in compliance with TEFRA, DEFRA, and REA. Respondent, by a March 28, 1991, final adverse determination letter, determined that plan 1 was disqualified for plan years ending August 31, 1985, 1986, and 1987, and for the plan year ending November 30, 1987. Respondent also correspondingly determined that the associated trust was no longer tax-exempt under section 501(a). The parties agree that plan 1 operated in compliance with the amendments required by TEFRA, DEFRA, and REA during all relevant times.

Due to the proposed disqualification of the plans and the possible adverse tax consequences to them, petitioners, during 1990, instituted suit in the West Virginia circuit court against their pension plan consultants, alleging that there was an agreement under which the consultants were to perform all administrative services for the pension and profit sharing plans of petitioners. More specifically, it was alleged that the pension consultants failed to prepare the qualification documents and plan amendments to insure compliance

with internal revenue acts and regulations, including TEFRA, DEFRA, and REA, and to prepare and file all necessary adoptions of plans and other necessary documents. Petitioners further alleged that the consultants were negligent in that they failed to file necessary or proper plan amendments as required by the Internal Revenue Service. Finally, petitioners sought $5 million in damages resulting from their loss of qualified pension plan status and the corresponding tax deferral attributable to such status.

## OPINION

Respondent determined that petitioners' distributions from the pension plan trusts were taxable even though they timely attempted to roll over the distributions into IRA's. Respondent's determination stems from the proposed disqualification of the pension plans. Respondent, for purposes of this case, agrees that plan 1 was operated within the statutory and regulatory tax law requirements, but that the failure to formally adopt a plan that complied with TEFRA, DEFRA, and REA and/or to obtain a ruling determination caused the disqualification.[5]

Petitioners pursue a two-pronged approach. Their primary position is that the plan was qualified even though it did not have a written plan document which was formally adopted and/or signed. Also, as a part of their primary position, petitioners argue that the law of the State of West Virginia would control and provide the standard as to whether their plan was adopted and in effect.[6] Alternatively, petitioners argue that if the plan was disqualified, then the amounts contributed prior to the first year of proposed disqualification constituted "good money" which is not taxable to petitioners because it was timely rolled over into an IRA.[7]

---

[5] Because we find plan 1 to be unqualified, it is not necessary to consider whether failure to obtain a ruling would have an effect on the plan's status.

[6] Petitioners did not argue or advance cases in support of the position that operational compliance subsequent to the new statutory requirements would effectively or implicitly cause amendment to the existing written plan, which admittedly was not in compliance with the new requirements. The parties stipulated that the "single disqualification issue to be decided is whether * * * John Fazi * * * caused the Company to timely adopt ¹ * * [the post-TEFRA prototype written plan]." Inherent in the parties' stipulation is that plan 1 was either qualified or disqualified depending upon whether we find that the new written plan was or was not adopted.

[7] Petitioners had also advanced a second alternative, that the amounts contributed in years prior to 1987 which were also subject to disqualification would have been includable in the contribution year and should not have been included in respondent's determination for 1987. Re-

A. *Was the Failure To Formally Adopt a Plan Fatal to the Qualified Status of Plan 1?*

The question of whether plan 1 was qualified is a threshold question to be resolved prior to our consideration of whether, and to what extent, the distributions to petitioners were taxable. If a plan is qualified, contributions made on behalf of employees are not taxable until distributed or made available to the employee. Sec. 401(a). If a plan is not qualified, employer contributions on the employee's behalf may be taxable. Secs. 402(b), 83. To be qualified, both a plan's terms and operations must meet the statutory requirements. *Buzzetta Constr. Corp. v. Commissioner*, 92 T.C. 641, 646 (1989); *Ludden v. Commissioner*, 620 F.2d 700, 702 (9th Cir. 1980), affg. 68 T.C. 826 (1977); *Hamlin Dev. Co. v. Commissioner*, T.C. Memo. 1993–89.

TEFRA, DEFRA, and REA made substantial changes to the qualification requirements for pension plans. There is no dispute here concerning whether plan 1 met the operational requirements of these acts. The parties have stipulated that plan 1 was operationally in compliance. The focus here is whether the terms of plan 1 met the form or establishment statutory requirements. According to respondent, it was the corporation's failure to amend the old plan documents or to adopt the restated post-TEFRA prototype that caused the disqualification of plan 1 for 1985, 1986, and 1987. Because petitioners do not argue that the old or existing written plan was amended to comply with the new statutory requirements, we need only address the question of whether the restated post-TEFRA prototype was adopted.

A revised qualified written plan was available, which, if timely adopted for plan 1, would have placed it in compliance with the statutes. That written plan had not been formally adopted, in that no written or formal contractual relationship had commenced between the corporation and General regard-

spondent, on brief, conceded that the deficiency determined must be reduced even if respondent is successful with respect to the legal issues because the amount included for contributions during the 1985 and 1986 years would be taxable to petitioners in those taxable years and not in the 1987 year, which is the only year being considered in this deficiency proceeding. Respondent explains that the proposed disqualification of the plan for each of the years 1985, 1986, and 1987 causes the reduction because the annual contributions for each disqualified year would have been taxable to petitioners for the year in which said contributions were made. Further, respondent points out that the merging of plan 2 into plan 1 during 1986 would be taxable in 1986, rather than in 1987 as determined in the notice of deficiency.

ing the restated post-TEFRA prototype. Petitioners argue that the post-TEFRA prototype written plan met the requirement of the statute and that State law should control the question of whether a valid writing existed and whether it had been adopted.

Section 1.401–1(a)(2), Income Tax Regs., contains the requirements that "A qualified pension * * * plan is a definite written program and arrangement which is communicated to the employees and which is established and maintained by an employer". Petitioners do not argue that a written plan is unnecessary. Instead, they argue that the failure to formally execute and adopt the revised plan should not be fatal. It should be noted, however, that General's revised plan was not a part of the corporation's, plan 1's, petitioners', or the consultant's records. Although that fact tends to make petitioners' argument somewhat tenuous, we do not find the lack of physical possession of a plan, standing alone, to be fatal.[8] Here a prototype plan was available and was determined to meet the statutory requirements.

Petitioners advance a single case for their position that the failure to formally adopt a revised plan is not a bar to qualification: *John Boettcher Sewer & Excavating Co. v. Midwest Operating Engrs. Welfare Fund*, 803 F. Supp. 1420 (N.D. Ind. 1992). That case involved a suit by an employer seeking a declaratory judgment as to whether it owed contributions to a local union's fund for employees' fringe benefits.[9] The District Court focused upon the reasonableness of a settlement amount that it was claimed the plaintiff/employer owed. In reaching its decision, the District Court considered whether the employer may have been subject to the law and, accordingly, whether it "owed" the amount claimed. In determining whether the settlement reached was reasonable, because the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93–406, 88 Stat. 829, did not address the subject matter of whether the settlement agreement could be revoked, the court looked to Federal common law to decide that issue. The court held that under the Federal common

---

[8] Under sec. 102(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93–406, 88 Stat. 829, 841, it is required that the plan be in writing and be communicated to the employees in an understandable form. Additionally, a summary must be furnished to participating employees within a certain number of days after they begin their participation.

[9] The suit was originally generally filed under ERISA and specifically under 29 U.S.C. sec. 186(c)(5) (Labor Management Relations Act).

law, oral settlement agreements are enforceable. In addition, the court noted that there was a written settlement agreement, although it was unsigned by the parties. Our reading of *John Boettcher Sewer & Excavating Co.* reveals that the District Court's statement concerning the existence of an unsigned writing was made in passing and, at most, could be considered obiter dicta unnecessary to the holding of that case. We find no meaningful connection between the District Court opinion and the issue we must consider.

An unsigned and unadopted pension plan would not meet the letter or spirit of section 401 and the underlying regulations. The requirement for a "definite written program and arrangement which is communicated to the employees" has no meaning if the employer lacks a written plan which is available and under which the employer is contractually obligated or committed. Sec. 1.401–1(a)(2), Income Tax Regs. The plans that were available to the corporation's employees were the pre-TEFRA prototype plans, which did not meet the statutory requirements of TEFRA, DEFRA, and REA.

Even if the restated post-TEFRA prototype (which did meet the statutory requirements) was available, the corporation had not adopted the revised plan or paid the required fee, and no contractual relationship existed with General, as required by the terms of the revised plan. Because the joinder agreement had not been executed, the restated post-TEFRA prototype plan would have been incomplete, with many significant terms left unstated and/or undefined. The joinder agreement contains elections concerning the plan effective date, the plan year and anniversary date, designation of the normal retirement age, the definition of the term "compensation", establishment of the integration level, establishment of eligibility requirements, designation of employer and employee contributions, and provision for top-heavy provisions and vesting rules. An unexecuted and unadopted plan would be of no comfort to employees who might have to rely upon the terms of a plan for their future security.

In a similar analysis concerning pension plans, this Court has considered whether unamended and inadequate plan terms should result in disqualification if those terms are not employed in the operation of the plans. The plans did not meet with success in those situations. See discussion in

*Tionesta Sand & Gravel, Inc. v. Commissioner*, 73 T.C. 758, 764 (1980) (citing *Jack R. Mendenhall Corp. v. Commissioner*, 68 T.C. 676, 678–679 (1977)), affd. without published opinion 642 F.2d 444 (3d Cir. 1981).

The essence of petitioners' position is that plan 1 was operationally qualified and so it must have been following the restated post-TEFRA prototype plan. The record in this case does not support a finding that plan 1 was operated in accord with the terms of General's restated post-TEFRA prototype plan, which respondent had approved. The parties simply stipulated that plan 1 was operated in accord with post-TEFRA requirements. Finally, we have held that operational compliance does not cure a plan's written deficiencies. See, e.g., *Attardo v. Commissioner*, T.C. Memo. 1991–357; *Stark Truss Co. v. Commissioner*, T.C. Memo. 1991–329; *Basch Engg., Inc. v. Commissioner*, T.C. Memo. 1990–212.

Petitioners also argue that State law controls the standard for adopting a written plan. Petitioners contend that State law determines whether or not a contractual relationship existed between the corporation and General, irrespective of whether the restated post-TEFRA prototype had been formally adopted by the corporation. Within the context of this argument, petitioners argue that in *Brewer v. First Natl. Bank*, 120 S.E.2d 273, 278 (Va. 1961), [10] the court allowed a family or closely held corporation's action to stand, although the action did not comply with the requirement that it be approved by a "formal resolution * * * at a duly constituted meeting." Petitioners point out that the rationale of that case is that the formalities are for the benefit of the stockholders and may be waived by the parties who benefit from the formality requirements.

We do not see the parallel between the State court case and the facts before us. In *Brewer* a corporate action was adopted, but it was unauthorized, and the court permitted the informality because the statutorily protected persons and the actor were one and the same. Here, Mr. Fazi remembers receiving a communication concerning the need to amend due to TEFRA, DEFRA, and REA from General and, in accord with established practice, forwarded it to the pension plan consult-

---

[10] The plan in question operated in the State of West Virginia, but petitioners suggest that there is some affinity between the laws of Virginia and of West Virginia.

ants. There is no evidence that the forwarded document was the restated post-TEFRA prototype plan or that it was informally adopted. Neither the corporation nor the pension consultants possessed a copy of a qualifying restated post-TEFRA prototype plan. Finally, there is no question that a qualified restated post-TEFRA prototype plan, if it existed in the context of the corporation's business, had not been properly adopted by means of the execution of the joinder agreement. Accordingly, even if State law were applicable to the circumstances of this case, there is no act of acceptance or establishment of a qualified post-TEFRA plan which can be treated as binding by means of respecting the unauthorized or informal acts of a corporate officer.

More significantly, petitioners have again failed to address one of the most prominent concerns behind the 1974 enactment of ERISA and subsequent amending acts, including the ones under consideration in this case. In great part, these acts are to protect the rights, interests, and future security of the employees. Even though petitioners were entitled to a lion's share of the benefits in plan 1 (83 percent at the time of dissolution and distribution), the interests of other employees were affected by the lack of a plan that complied with current statutes. We would be remiss to myopically interpret these pervasive statutory provisions solely in light of the facts of this case. Moreover, the essence of petitioners' State law position is also that, operationally, the plan met the statutory requirements. As explained above, that is insufficient and will not cause compliance with the form or organizational requirements of section 401 and the regulations. Even if State law would permit the sanctioning of a corporate officer's unauthorized act, no such act occurred here, and in either event it would not have satisfied the explicit requirement of a "definite written program and arrangement which is communicated to the employees".

Accordingly, we hold that plan 1 was not qualified and its employee trust was not exempt for the plan years ending in 1985, 1986, and 1987.

B. *What Amount of the 1987 Distributions to Petitioners, If Any, Is Taxable for the 1987 Taxable Year?*

1. *Background*—If, as we have found, plan 1 was not qualified during its 1985, 1986, and 1987 plan years, petitioners argue that the taxable portion of the distribution is limited to those amounts representing contributions made during years in which the plan and trust were unqualified. According to petitioners, the remainder of the contributions, which were made when the plan and trust were qualified, constitute "good money" which was qualified for rollover into an IRA, and therefore, further deferred and not presently taxable to petitioners. The essence of this issue is whether the qualified status is determined at the time of distribution or contribution. Petitioners find support in several opinions of this Court for their position.

Respondent counters that petitioners have misread section 402 and related statutes to reach their position. Respondent points out that petitioners' reliance upon our opinions is vulnerable because of reversals by three Courts of Appeals. This case would be appealable to the Court of Appeals for the Fourth Circuit, which has not specifically addressed the issue in controversy. Accordingly, petitioners urge us to adhere to our prior holdings. Respondent has requested that we reconsider our treatment of this issue and determine whether we are now in agreement with the reversing Courts of Appeals.

2. *The Statutory Scheme*—Section 402 concerns the taxability of distributions from employee trusts. Distributions from qualified and unqualified trusts are dealt with in section 402(a) and (b), respectively. Section 402(a)(5) relates to continued deferral by means of rollovers from qualified trusts, including rollovers to eligible retirement plans, including IRA's. If a plan and the employee trust are qualified at the time of a distribution, several choices are available to employees. Where a plan and the employee trust are unqualified, the appropriate tax treatment of distributions has been subject to considerable controversy. The controversy has centered on two different aspects [11] of section 402, but

---

[11] The two aspects of sec. 402 concern whether the distribution will be subjected to favorable capital gain tax rates, sec. 402(a)(2), or whether the distributee will be allowed continued defer-

the fundamental issue has been the same—the tax effect on the portion of a distribution which was contributed or accumulated during qualified status, but distributed when the plan and/or trust was unqualified. The courts addressing the issue have all agreed that the language of these two statutory provisions is, at very least, substantially similar, and the subsections have been treated in tandem by the various courts considering the issue. This Court and the Court of Appeals for the Second Circuit have held that the subsections permit favorable treatment to that portion of the distribution attributable to contributions made while the plan was qualified, even though distributed while the plan was unqualified. The Courts of Appeals for the Fifth, Sixth, and Seventh Circuits have held that the same subsections do not permit such favorable treatment if distributed during unqualified status.

3. *Litigation History*—The first opinion to analyze the treatment of a distribution from an unqualified plan or trust was issued by the Court of Appeals for the Second Circuit. *Greenwald v. Commissioner*, 366 F.2d 538 (2d Cir. 1966), affg. in part and revg. in part 44 T.C. 137 (1965). In that case, this Court first decided that the employee/distributee of an unqualified trust was not entitled to capital gains with respect to the distribution. Our *Greenwald* opinion did not contain an analysis of section 402(a)(2), but tacitly accepted the precept that the entire distribution from an unqualified plan would be subjected to ordinary income rates irrespective of whether any portion of the distribution accumulated when the plan was qualified.

The Court of Appeals for the Second Circuit agreed with our holding that the trust was not exempt at the time of the distribution. Noting that ordinary income treatment of the distribution was a harsh result,[12] the Court of Appeals con-

---

ral by rolling over to a qualified plan, sec. 402(a)(5). Sec. 402(a)(2) was repealed prior to the 1987 taxable year.

[12] The "harshness" discussed in the opinion of the Court of Appeals for the Second Circuit related to the fact that the plan had been qualified and became discriminatory due to corporate transformations. The taxpayer was one of several controlling shareholders in a corporation whose assets were sold. The taxpayer and two secretaries remained in the original corporate shell, which became an investment company. The Court of Appeals surmised that the other employees of the original corporation probably received capital gains treatment regarding any distributions made to them at the time of the corporate transformation and that it would be "harsh" to treat the taxpayer before the court differently. *Greenwald v. Commissioner*, 366 F.2d 538, 541 (2d Cir. 1966), affg. in part and revg. in part 44 T.C. 137 (1965).

cluded that nothing in the language of section 402(a)(2) or related sections prohibited a year-by-year consideration of whether the trust was qualified or unqualified. In other words, it was held that the tax treatment of the distribution would be judged by reference to the period(s) in which it was contributed or accumulated. The Court of Appeals' opinion does not contain a detailed analysis of section 402(a)(2) and only references section 402(b) as providing support for a year-by-year analysis of qualified status.

Nine years after the Court of Appeals for the Second Circuit's opinion (1975), a District Court, in its opinion involving the same fact pattern, adopted the *Greenwald* rationale and allowed capital gains treatment. *Pitt v. United States*, 35 AFTR 2d 75–1492, 75–1 USTC par. 9472 (M.D. Fla. 1975). Three years later (1978), this Court denied capital gains treatment in a factually similar situation, distinguishing *Greenwald* and *Pitt* because the disqualification resulted from discrimination caused by a change in the plan brought about by the highly compensated officer/employee who was the taxpayer in *Epstein v. Commissioner*, 70 T.C. 439, 444–445 (1978).

About 2 years later (1980), in a Court-reviewed opinion with three judges dissenting, this Court announced that the decision in *Epstein v. Commissioner, supra*, was in error and would not be followed and that the holding and rationale of the Court of Appeals for the Second Circuit in *Greenwald v. Commissioner, supra*, would be followed. *Woodson v. Commissioner*, 73 T.C. 779 (1980), revd. 651 F.2d 1094 (5th Cir. 1981). At the time of our *Woodson* opinion, there was agreement amongst three different courts concerning the treatment under section 402(a)(2) of distributions from unqualified trusts. The Court of Appeals for the Fifth Circuit, however, reversed our holding in *Woodson* and held that the language of section 402(a)(2) explicitly requires ordinary income treatment for the distribution from an unqualified trust. *Woodson v. Commissioner*, 651 F.2d at 1095. The Court of Appeals disagreed with this Court's—

view that Congress has not spoken with clarity in this context. Section 402(a)(2) explicitly limits capital gains treatment of "lump sum distributions" to instances in which the *distribution* flows from an employee trust "which *is* exempt from tax under section 501(a)." [The court further explained that] To remove any doubt about its intent to legislate this

limitation, Congress defined "lump sum distribution" as "the distribution or payment within one taxable year . . . from a trust which forms a part of a plan described in section 401(a) and which is exempt from tax under section 501 . . . ." * * * [*Id.* (quoting sec. 402(e)(4)); fn. ref. omitted.]

In addition, the Court of Appeals noted that to uphold our opinion "would abrogate" section 1.402(a)–1(a)(1)(ii), Income Tax Regs. *Id.* at 1096.

Three years after the *Woodson* reversal (1984), we considered several cases involving whether the distribution from an unqualified trust was taxable where the taxpayer had attempted to roll over the distribution into an IRA under section 402(a)(5): *Baetens v. Commissioner*, 82 T.C. 152 (1984); *Benbow v. Commissioner*, 82 T.C. 941 (1984); and *Boggs v. Commissioner*, 83 T.C. 132 (1984). *Baetens* was a Court-reviewed case with five judges dissenting. In our *Baetens* opinion we held that (1) paragraphs (2) and (5) of section 402(a) are analogous and contain identical statutory requirements regarding the trust status, *Baetens v. Commissioner*, *supra* at 158; (2) to the extent inconsistent with the holding, the regulation section referred to by the Court of Appeals for the Fifth Circuit in *Woodson v. Commissioner, supra*, was invalidated, *Baetens v. Commissioner, supra* at 163–165; (3) the Tax Court would not follow the Court of Appeals for the Fifth Circuit in *Woodson v. Commissioner, supra* (other than in the Fifth and Eleventh Circuits),[13] *Baetens v. Commissioner, supra* at 161–163; and (4) the Tax Court would continue to follow the Court of Appeals for the Second Circuit in *Greenwald v. Commissioner*, 366 F.2d 538 (2d Cir. 1966).

Two of the 1984 cases (*Baetens* and *Benbow*) were reversed by Courts of Appeals whose opinions were in accord with the Court of Appeals for the Fifth Circuit's *Woodson* rationale— that the language of section 402(a)(2) or (5) explicitly requires ordinary income treatment or taxability for the distributions from an unqualified trust. *Baetens v. Commissioner*, 777 F.2d 1160 (6th Cir. 1985); *Benbow v. Commissioner*, 774 F.2d 740 (7th Cir. 1985). The Court of Appeals for the Fourth Circuit, however, in *Boggs v. Commissioner*, 784 F.2d 1166 (4th Cir. 1986), held that the trust was qualified in the year of the distribution so that the section 402(a)(5)

---

[13] Opinions of the Court of Appeals for the Fifth Circuit rendered prior to the creation of the Court of Appeals for the Eleventh Circuit are binding in the Eleventh Circuit.

rollover did not result in a taxable event. Accordingly, the Court of Appeals for the Fourth Circuit did not have occasion to address the situation where a distribution occurs at a time when the trust is unqualified. [14] Following the *Baetens* and *Benbow* reversals, we have not had the opportunity to address this issue until this case. In view of the conflict among the Courts of Appeals and the successive reversals of our holding by three Courts of Appeals, we take this opportunity to reconsider this issue.

4. *Reconsideration of Our Holding in Baetens v. Commissioner*—At the time we rendered our *Baetens* opinion, two Courts of Appeals had addressed the issue, albeit one during 1965 (Second Circuit) and the other during 1981 (Fifth Circuit). In addition, there was a District Court case which had adopted the Court of Appeals for the Second Circuit's rationale. Instead of section 402(a)(2), in *Baetens* we considered section 402(a)(5), which generally provides for continued tax deferral by means of a rollover of a distribution. In pertinent part, the statute describes the distribution as "the balance to the credit of an employee in a qualified trust that is paid to him" in a qualifying rollover distribution. Sec. 402(a)(5)(A)(i). A "qualifying rollover distribution" is defined as one "which [constitutes] a lump sum distribution within the meaning of subsection (e)(4)(A)". Sec. 402(a)(5)(E)(i)(II). Section 402(e)(4)(A), in pertinent part, defines "lump sum distribution" as a distribution "within one taxable year * * * to * * * an employee * * * from a trust * * * which is exempt from tax". In addressing situations where the "distribution" is from more than one trust, section 402(e)(4)(C)(ii) excludes any distribution from an unqualified trust by use of the following language: "trusts which are not qualified trusts under section 401(a) * * * shall not be taken into account" or aggregated with distributions from qualified trusts.

The statutory phrases being interpreted in these cases are stated in the present tense by means of the use of the word "is". Sec. 402(e)(4)(A), (a)(2).[15] In *Baetens* we interpreted the "which is exempt from tax" language as referring to the time

---

[14] See, however, *Boggs v. Commissioner*, 784 F.2d 1166, 1171–1172 (4th Cir. 1986) (Hall, J., dissenting).

[15] Sec. 402(a)(2) limited capital gains treatment of "lump sum distributions" where the distribution is made from an employee trust "which is exempt from tax under section 501(a)".

when the contributions are made and not the time the distribution to the employee occurs. 82 T.C. at 161–163. We focused upon the word "is" and decided that it spoke to the requirement that there be exempt status and not to when the exempt status must exist. *Id.* at 163. Having decided that the verb "is" was not referring to the exempt status of the employee trust at the time of the distribution, we looked to section 402(b) for guidance as to when the exempt status must exist. Section 402(b), in pertinent part, provides that contributions to an employee trust that is not exempt under "section 501(a) shall be included in the gross income of the employee". Although section 402(b) is more complex than the limited portion shown here, [16] the gist of that section is to treat the exempt status on a year-by-year basis for purposes of the taxability of a contribution made by or on behalf of an employee. Although in *Baetens* we used section 402(b) as guidance in the analysis of this issue, the purpose of section 402(b) is not the same as the purpose of section 402(a)(5). The portion of section 402(b) quoted above is concerned with contributions made to a trust that is not tax-exempt, where the contribution becomes taxable even though it is not actually received by the employee and it remains in the possession of the employee plan trust. Section 402(b) also addresses situations where a nonexempt trust makes an actual distribution to the employee.

Accordingly, section 402(b) can have the effect of causing employees to report as taxable a contribution made to an unqualified trust. Of course that is a circumstance which must be judged on a year-by-year basis. In the *Baetens* opinion we stated that Congress had dealt with distributions from a qualified plan under section 402(a) and distributions from unqualified plans under section 402(b). *Baetens v. Commissioner*, 82 T.C. at 165. We further stated that Congress had not dealt with or provided for distributions from plans that have occupied both a qualified and an unqualified status at different times. *Id.* This does not necessarily follow. If contributions to an unqualified trust are taxable in the year made, then those contributions would not again be taxable at the time of distribution, whether that distribution

---

[16] The inclusion in income is accomplished in accord with sec. 83, and other modifications may be called for under sec. 72.

was received from a qualified or unqualified plan. See sec. 1.402(a)–1(a)(1)(iv), Income Tax Regs. Because the contributions during unqualified status could have already been taxed, it becomes difficult to conceptualize the need for taxing them again in the year distributed. Because the majority in *Baetens* would tax only that portion of the distribution which accumulated or was contributed during a period when the trust was unqualified, that interpretation would not comport with the need to consider qualified or unqualified status in the year of distribution in the context of section 402(a)(5) and would render the quoted language of that section and of section 402(e)(4)(A) meaningless. Accordingly, the *Baetens* approach would work only in situations where a plan has been retroactively disqualified.

In that regard, respondent has conceded that the taxable distribution for 1987 should not include those contributions made during 1985 or 1986 because they would be taxable to petitioners in the years contributions were made to an unqualified trust and not at the time of distribution. Additionally, because the amount in plan 2 was merged into plan 1 during May 1986, a year in which the plans and the trusts were unqualified, that amount would likewise be taxable in 1986, rather than 1987.

The rationale underlying our *Baetens* position on this issue is founded on a plausible point of view and interpretation of the statutes. That interpretation would be conspicuously more equitable in situations where "rank and file" employees (without control over their fate) receive distributions which accumulated when a trust was qualified and were distributed when it was unqualified. On the other hand, that same interpretation would be conspicuously out of sync with the intent of the pension and profit sharing sections where highly compensated executives (with control over their fate and who were the cause of the disqualification) experience a similar outcome. Although our *Baetens* rationale has been praised as the "most reasonable application"[17] of the congressional purposes underlying the pension and profit sharing sections, it has resulted in an enduring conflict

---

[17] See Markowitz, *"Baetens v. Commissioner*: Putting the Pinch on Pensions", 39 Tax Law. 665 (1986).

between the Courts of Appeals and our Court and, hence, diametrically differing treatment for taxpayers.

The rationale of the Courts of Appeals for the Fifth, Sixth, and Seventh Circuits is a literal interpretation of the statutes, although less equitable in result. The Court of Appeals for the Sixth Circuit recognized the inequities of taxing an employee's distribution from an unqualified plan under certain circumstances, but pointed out that it was for Congress to remedy this result. *Baetens v. Commissioner*, 777 F.2d at 1164. Further, the persuasive statutory analysis of the Court of Appeals for the Sixth Circuit, along with the references to legislative history, has been adopted by the three Courts of Appeals which have considered this matter subsequent to pervasive legislative changes made in the pension area by ERISA, TEFRA, DEFRA, and REA. We note that the analysis of the Court of Appeals for the Second Circuit, although compelling in an equitable and practical sense, was rendered in 1965, prior to these major legislative changes in the perspective, as well as the requirements, of pension provisions of the Internal Revenue Code. In this setting, we adopt the view that the untaxed portion of a distribution from an unqualified plan is to be treated in accord with the statutory provisions, and the result is to be dependent upon exemption or qualification at the time of distribution.[18] To do otherwise at this juncture would further complicate the varying treatment of taxpayers situated in different Federal appellate jurisdictions. This conflict has existed since 1986 without congressional reaction.[19]

Accordingly, we overrule our holding in *Baetens v. Commissioner, supra*, and will follow the holding of the Courts of Appeals for the Fifth, Sixth, and Seventh Circuits with respect to the time when the trust must be qualified regarding distributions. Therefore, petitioners are taxable on the distributions received to the extent they exceed contributions made for or by them for 1985 and 1986, including the amount merged from plan 2 to plan 1 during 1986.

---

[18] Our invalidation of sec. 1.402(a)–1(a)(1)(ii), Income Tax Regs., was based upon a rationale that sec. 402(a)(5) had a meaning opposite to the one we will now follow. Accordingly, we no longer consider that regulation to be invalid.

[19] Although a myriad of different possibilities could be advanced for the failure of Congress to change sec. 402(a)(5) during the recent litigation hiatus (1984–93), one possibility that prominently stands out from others is that the statute already explicitly addresses the issue and legislative change is unnecessary.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

HAMBLEN, CHABOT, PARKER, COHEN, SWIFT, JACOBS, WRIGHT, PARR, COLVIN, HALPERN, BEGHE, CHIECHI, and LARO, *JJ.*, agree with this opinion.